Leroy JACOBS, Appellant,

v.

CITY OF JEFFERSON, Respondent.

No. WD 55871.

Missouri Court of Appeals,
Western District.

Submitted Dec. 2, 1998.

Decided April 27, 1999.

Ronald J. Prenger, Jefferson City, for Appellant.

Susan M. Turner, Jefferson City, for Respondent.

Before ULRICH, P.J.; SMART and EDWIN H. SMITH, JJ.

PER CURIAM.

Leroy Jacobs appeals the decision of the Labor and Industrial Relations Commission ("Commission") denying him compensation under Chapter 287, the Workers' Compensation Act, for a claimed occupational injury. Jacobs claims that the Commission erred in affirming the Administrative Law Judge's ("ALJ") determination

that he failed to establish a causal connection between his work as a firefighter and his respiratory condition. Jacobs contends he proved that part of his medical condition is due to his employment as a firefighter and that the competent and substantial evidence in the case shows that his condition is an occupational disease.

The judgment of the Commission is affirmed.

## Factual Background

Jacobs, now age 58, was a full-time firefighter in Jefferson City, Missouri, for twenty-seven years. Throughout his firefighting career, Jacobs was involved in "thousands" of fires, which exposed him to fumes from a variety of products. Jacobs did not work seven days per week at the fire department. Rather, he worked three or four twenty-four hour shifts per week. Jacobs testified that after approximately fifty percent of the fires he would be coughing up black phlegm for two to three days.

In 1980, the Jefferson City Fire Department began using "Scotts Air Packs," consisting of a rubber mask and a hose that screws into an air regulator, which is then hooked into an air tank. These air packs provide fire fighters with fresh air while fighting fires, and since 1980, firefighters have been required to wear them. Jacobs worked as a firefighter for approximately fourteen years before the Department began using the air packs.

In June 1993, Jacobs noticed a breathing problem during a fire; he was unable to breathe through his air pack bottle mask. Initially, he thought his air pack was not working; however, he began noticing that his shortness of breath resulted from activities requiring physical exertion, such as climbing stairs. When advancing in line during a drill fire, Jacobs pulled off his air mask because he was unable to breathe. Several of Jacobs' co-workers tested Jacobs' air pack and none had a problem breathing through it.

Jacobs consulted his family physician, Dr. James Allen, who had been treating him for high blood pressure since approximately 1970. Jacobs complained to Dr. Allen that he was unable to breathe through his air pack bottle mask, and Dr. Allen referred Jacobs to Dr. Thomas Schneider, a pulmonary specialist. On June 15, 1993, Dr. Schneider ran some tests on Jacobs and prescribed an inhaler for him. Dr. Schneider believed that Jacobs' pulmonary disease was related to his employment as a firefighter. He said that exposure to past fires "had not helped" his current condition. On September 20, 1993, Dr. Schneider placed Jacobs on sick leave.

On January 8, 1994, Jacobs was allowed to return to work for light duty. Ultimately, a dispute about his job status between the Fire Department and the City Administrator caused Jacobs' blood pressure to increase; leading eventually to his retirement from the Fire Department in May 1994.

Prior to 1993, Jacobs' medical history with respect to respiratory conditions was a single case of acute bronchitis in 1960. At the time his respiratory problems arose, Jacobs smoked roughly one pack of cigarettes per day and had been smoking for approximately twenty-two years. All of the medical experts in this case agreed that Jacobs pulmonary disease constituted an impairment of approximately twenty-five percent of his whole person.

The issue on which the case turned was whether there was an occupational related component of Mr. Jacobs' pulmonary disease. The key testimony was that of Kirk Flury, M.D., which is discussed below.

On February 11, 1998, the ALJ found that there was no causal connection between Jacobs' pulmonary disease and his work at the fire department. Consequently, Jacobs was denied benefits under Chapter 287. On April 29, 1998, the Com-

mission issued a final award, affirming the ALJ's decision. Jacobs appeals.

## Standard of Review

■ Our authority to review the Commission's decision is set forth in § 287.495, RSMo 1994.[1] We may modify, reverse or remand the Commission's final award if we find "the facts found by the commission do not support the award," § 287.495.1(3), RSMo 1994, or "there was not sufficient competent evidence in the record to warrant the making of the award." § 287.495.1(4), RSMo 1994; *see also Feltrop v. Eskens Drywall & Insulation,* 957 S.W.2d 408, 412 (Mo.App.1997). Section 287.067.2 incorporates the requirement of § 287.020 that the work exposure be "a substantial factor" in the cause of the resulting medical condition. Our process of reviewing the Commission's decision is two-fold:

> In the first step, the court examines the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the record contains sufficient competent and substantial evidence to support the award. If not, the Commission's award must be reversed. If there is competent and substantial evidence supporting the award, the court moves to the second step, where it views the evidence in the light most favorable to the award, but' must consider all evidence in the record, including that which opposes or is unfavorable to the award, take account of the overall effect of all of the evidence, and determine whether the award is against the overwhelming weight of the evidence.

*Davis v. Research Med. Ctr.,* 903 S.W.2d 557, 571 (Mo.App.1995).

1. All statutory references are to the Revised Statutes of Missouri, 1994, unless otherwise indicated.

### Establishment of Causal Relationship

■ Jacobs claims that the Commission erred in affirming the ALJ's findings that he failed to establish a direct causal relationship between his work as a firefighter and his respiratory condition. Jacobs argues that he has proven that part of his respiratory condition is causally connected to this employment as a firefighter. Moreover, Jacobs argues that the competent and substantial evidence in the case showed that his condition was an occupational disease.

■ An occupational disease is defined as "an identifiable disease arising with or without human fault out of and in the course of the employment." § 287.067.1, RSMo 1994. "Ordinary diseases of life to which the general public is exposed outside of the employment shall not be compensable, except where the diseases follow as an incident of an occupational disease as defined in this section." *Id.* "Disease of the lungs or respiratory tract ... may be recognized as occupational diseases for the purposes of this chapter ... if a direct causal relationship is established." § 287.067.5, RSMo 1994. "The question of causation [is] one for medical testimony, without which a finding for claimant would be based on mere conjecture and speculation and not on substantial evidence." *Welker v. MFA Central Co-Operative,* 380 S.W.2d 481, 487 (Mo.App. 1964). The claimant bears the burden of proving a direct causal relationship between the conditions of his employment and the occupational disease. *See Estes v. Noranda Aluminum, Inc.,* 574 S.W.2d 34, 37–38 (Mo.App.1978).

Jacobs began his employment with the fire department in approximately 1966. In 1971 or 1972, Jacobs began smoking. He smoked between one and two packs of cigarettes per day. In 1980, the fire department began requiring firefighters to use Scotts Air Packs, which provided smoke-free air for the firefighters to breathe when battling fires. Jacobs first noticed a respiratory problem in 1993, thir-teen years after the department's utilization of the Scotts Air Packs.

Dr. Flury evaluated Jacobs on October 31, 1994, and diagnosed Jacobs with "chronic asthmatic bronchitis." Dr. Flury said "[t]his is a typical end result of long-standing tobacco use are [sic] other irritant type exposures ... this is a very common pattern of abnormality that's seen typically in the 45 to 65–year–old adult population." Dr. Flury concluded that the parameters of Jacobs' air flow obstructions were reduced by twenty-five to thirty percent from what would be expected of a normal, healthy non-smoker of Jacobs' age. However, Dr. Flury opined that "a substantial number of patients" who are "simply cigarette smokers" will end up with exactly "the same pattern of abnormality" as seen with Mr. Jacobs. Dr. Flury added that "this is the most common problem we see in patients with long-standing adult tobacco use." He said that "long-standing tobacco use result[ed] in this pattern of impairment in many individuals with no occupational exposure at all. In and of itself the tobacco use [was] adequate enough to explain [Jacobs' impairment]." Dr. Flury discussed various medical studies which "failed to really demonstrate that there appears to be a significant incidence of increased respiratory complaints in the fire fighting population when smoking [was] eliminated as a variable." When asked whether it was more difficult to assess causation when long-term tobacco use was also a component of the condition, Dr. Flury responded:

Well, it certainly confounds the conclusions because you don't have a clean picture. Of all the respiratory hazards that are available in the country today, tobacco represents by far the most wide spread and well known, well documented respiratory hazard. Anything else is a minor contribution in comparison. So any time that you have a group of employees or exposed people who are also heavy smokers, the results of this are tainted because the smoking is such a

more confounding exposure; that is, if someone is smoking 20 to 30 cigarettes a day on a daily basis which may be six or 7,000 cigarettes a year, the intensity and the significance of that exposure far overwhelms, in most cases, any other occupational exposure that they may have except for some extraordinary circumstances. So it's very difficult in any occupational setting to separate the effects of the occupation and the effects of the smoking.

Now, in situations where that has been done there are some occupations that do fall out and demonstrate that there is an independent effect of that kind of exposure. Firefighting is not one of those. In the studies that have been done in fire fighters there has been a very minimal or limited ventilatory detriment that occurs in long-standing non-smoking fire fighters in general.

Thus, Dr. Flury presented the picture that, if Mr. Jacobs had not been a smoker, the amount of impairment he would be experiencing would be negligible in comparison to the twenty-five to thirty percent impairment he was actually experiencing. Dr. Flury's emphasis on the "confounding" of conclusions also suggests that he could not tell whether occupational exposure was a directly contributing factor in the impairment. He stated that it was very difficult to make a specific statement as to the actual degree to which the occupational factors contributed to the impairment. Dr. Flury said that "without detailed work histories and without detailed ventilatory functional studies that had been done recently after certain types of exposure and episodes, there really is no way to resolve these things." He also mentioned the possibility that medication which Mr. Jacobs was taking for hypertension could have contributed to his asthma, thus aggravating his condition.

On cross-examination, Jacobs' attorney inquired further about the possible influence of the work environment:

Q. But none of [the doctors examining Mr. Jacobs] discount completely the influence of the work environment on his condition, do they?

A. That's correct. Ideally he would have been better had he not been employed as a fireman. But whether or not this is – let's just take the numbers, and this is not a medical calculation but this is sort of a layman's calculation. If he's got 30 percent of impairment at this point and if 75 percent of that impairment or 80 percent of that impairment has to do with cigarette smoking, that means without the cigarette smoking he would have four or five percent ventilatory impairment. Now, that's exactly the amount of ventilatory impairment that is measured in most long-term fire fighters who have not been smokers; that is, in comparison to the impairment in the 4 or 5 percent range in comparison to the normal population. So, yeah, you don't discount the fire fighting exposure, but what you're saying, however, is the vast majority of ventilatory abnormalities that we're seeing here are more easily explained and more likely to be as a result of smoking, and whatever minor impairment exists as a result of the fire fighting probably would not have resulted in disability or significant ventilatory limitation.

Those are the conclusions that you would reach based on the literature that's available and so forth. If there's specific factors in terms of Mr. Jacobs' case that would say that different conclusions ought to be reached, you know, they haven't been made available to me and I don't really [see] those in Dr. Lampton's and Dr. Schneider's reports.... If you're just talking in general which is what we're doing here, it doesn't seem to me that Mr. Jacobs' exposure is all that unique and all that different than the vast majority of fire fighters that have been studied and we're talking about thousands.

Taking the doctor's testimony in total, and evaluating it, we conclude that there are nuances in the doctor's testimony which could be interpreted somewhat differently. However, we believe the commission could reasonably have understood Dr. Flury's testimony in the way which we could summarize as follows:

There is no specific or direct evidence that Jacobs' occupation as a firefighter directly caused or contributed to his lung disease. It is impossible to specifically determine, without detailed work histories and contemporaneous lung function studies, whether Mr. Jacobs' occupation was a factor in his disability. However, because of general studies concerning firefighters which found minor ventilatory impairment in veteran firefighters, we may infer that it is likely that Jacobs would have had minor impairment, like the vast majority of firefighters, even if he had never smoked a single cigarette. That degree of ventilatory impairment is an asymptomatic degree of impairment, constituting no disability.

■ The commission in this case had to determine whether Jacobs had met his burden of showing that his occupation caused or contributed to cause his pulmonary disease. A claimant must submit medical evidence establishing a probability that working conditions caused the disease, although they need not be the sole cause. *Prater v. Thorngate, Ltd.*, 761 S.W.2d 226, 230 (Mo.App.1988). If a claimant shows that working conditions activated or accelerated a preexisting disease, the claim is compensable. *Jackson v. H.D. Lee Co., Inc.*, 772 S.W.2d 742, 747 (Mo.App.1989); *Cowick v. Gibbs Beauty Supplies*, 430 S.W.2d 626, 630 (Mo.App.1968). Section 287.067.2 provides that an occupational disease is compensable if it is "*clearly* work related . . . ." (emphasis added). That section also incorporates the requirements of § 287.020 for a compensable injury, one of which is that the work "was a *substantial factor* in the cause of the resulting medical condition or disability . . . ." § 287.020.3(2)(a), RSMo 1994. (emphasis added).

Dr. Flury's testimony was susceptible of being interpreted as indicating that he was unable to say that the firefighting was a substantial factor in causing or contributing to the pulmonary disease. Dr. Flury said that without detailed work histories and without detailed ventilatory function studies performed right after specific work episodes, there was no way to resolve the issue of occupational exposure as a factor in his lung disease. Although he could not rule out the occupational exposure as a substantial factor, he also could not specifically rule it in, because every aspect of Jacobs' condition could be explained exclusively as a result of smoking.

■ Our standard of review requires that we view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, in determining whether the claim meets the statutory criteria of being "clearly work related," and whether the occupational exposure was "substantial factor" in the disability. Claimant, on appeal, relies almost exclusively on a letter written by Dr. Flury before his deposition in which Dr. Flury indicated that the great majority of the lung disease, greater than seventy-five percent, was attributable to smoking, while the lesser portion may be related to his employment as a firefighter. While this letter, considered in isolation, may suggest that the firefighting experience was a substantial factor in his disability, Dr. Flury's oral testimony could reasonably have been regarded as more definitive and more explanatory than the comment in the letter. His oral testimony indicated that he could not state that the occupational exposure was a substantial contributing factor in the disability.

**Conclusion**

Because the Commission could reasonably have interpreted the medical testimony as failing to demonstrate that Jacobs'

occupational exposure was a substantial contributing factor to his pulmonary. disease, the Commission's denial of disability benefits to Jacobs is affirmed.