Deann HENLEY, Claimant–Appellant,

v.

**FAIR GROVE R–10 SCHOOL DISTRICT, Employer– Respondent.**

No. 28565.

Missouri Court of Appeals, Southern District, Division Two.

May 20, 2008.

David Jerome, Brown & Brown, of Fairview Heights, IL, for Appellant.

Michael D. Mayes, Evans & Dixon, L.L.C., of Springfield, MO, for Respondent.

GARY W. LYNCH, Chief Judge.

Deann Henley ("Claimant") sought workers' compensation benefits for an alleged mold-induced allergy which she contends was developed while employed as a teacher at Fair Grove R–10 School District ("Employer"). Following a final hearing before the Division of Workers' Compensa-tion, the Administrative Law Judge ("ALJ") denied her claim. Upon Claimant's application for review, the Labor and Industrial Relations Commission ("Commission") found the ALJ's award was supported by competent and substantial evidence and affirmed the decision. Claimant appealed. We affirm.

### Factual and Procedural Background

Claimant was a second-grade school teacher at Employer's elementary school for one year. Her originally assigned classroom, designated LL2, was located in the lower level of a two-level addition which had experienced some flooding in the past. When she began her employment at the start of the fall semester in August 2001, access to her classroom was delayed, due in part to there being water on the floor. As Claimant was able to access her classroom, she noticed it was "dank" and "smelled very mildewy." Claimant found mold growing on a wall behind shelving units. She noticed "water damage on the books[,]" and materials on the shelves had "grit and stuff on them that you could just wipe off." Under the desks, which "had a gritty feeling to them," she observed "spots of mold" and "blackness." Fellow teachers indicated to Claimant that these conditions were not uncommon upon their return following summer vacation and advised her to clean off the books and wipe off the mold.

According to Claimant, she began developing problems two months after the start of the school year. In September and October, she experienced difficulty breathing and reported itchy eyes, a runny nose, and a cough. She testified that by November and December, she "was having big issues with" sleep problems, in that she would stop breathing and startle awake. She began to notice that she was breathless for a period of time after walking with

her students to and from their physical education class. She testified that these problems seemed to subside when she was away from the building on weekends and during school breaks.

Sometime around the first week in November 2001, Claimant believed she might be developing bronchitis, and on November 13, 2001, she consulted her physician, Scott A. Ellis, D.O., in Springfield. However, according to Claimant, bronchitis was not diagnosed, and Claimant told the school principal that her doctor believed that relocating to another classroom might help her situation. In response, Employer approved Claimant's move on the following Monday morning to a newly constructed classroom, designated LL8, down the hall from her original room. Claimant stated that her symptoms thereafter initially "got somewhat better[.]"

Dr. Ellis' records of Claimant's visit on November 13, 2001, indicate that her subjective symptoms and his objective observations of her appeared to suggest to him "viral bronchitis" or "[u]pper airway irritation or possibly infection." He prescribed Claimant an Albuterol rescue inhaler and Nasacort nose spray. Claimant reported that the medications improved her symptoms, "but they didn't make [them] go away."

In March 2002, according to Dr. Ellis' records, Claimant presented:

complaining of some sleeping difficulties. She has been waking up in the middle of the night because of either stopping breathing or snoring. She is not real sure. Her husband has witnessed a lot of snoring recently as well as her breathing ceasing while she is sleeping. The snoring appears to be getting progressively worse.... She has not been using her albuterol inhaler recently because she has not felt as though she needed it all that much.

Dr. Ellis referred Claimant to James L. Hargis, M.D., for pulmonary-function testing, and Gregory K. Lux, M.D., for an allergy evaluation.

Claimant testified that during her spring break in March, she began using a nebulizer four times per day, and by the end of spring break, she "was doing much better." She also used a "peak flow monitor" to test her lung capacity. When she returned to school following spring break, her peak flow readings went down "[q]uite a bit." Claimant stated that her symptoms persisted throughout the school year, although she reported that her symptoms had improved somewhat with medication.

According to Claimant, at some time after she moved to classroom LL8, the air quality of the classroom to which she was originally assigned, LL2, was tested and the entire room cleaned with bleach. It was later sealed and taken out of use during the remainder of the school year.

Claimant photographed various problem areas within the wing where her original room, LL2, was located, including that room, classroom LL1 across the hall, a supply closet, and flooring. On the final day of the 2001–2002 school year, Claimant also obtained samples of mold she found around the building ("bulk samples"). Claimant resigned from her teaching position at the end of the 2001–2002 term.

Claimant also testified that her menstrual periods became "very erratic, unpredictable" while she was employed at Fair Grove. Since she left, her periods have returned to normal. Although she acknowledged having bronchitis on one occasion before teaching at Fair Grove, Claimant later stated she never had any respiratory problems until she began her employment at the Fair Grove school. She testified that she continues to experience breathing problems, specifically when

reading aloud and during physical activities and exercise. Claimant reported sensitivity to chalk dust, cleaning products, and other chemicals, and stated that she cannot swim in indoor pools because her chest begins to tighten and hurt. At the time of the hearing, Claimant was prescribed Singulair, Advair, Rhinocort, and Allegra, and she used a nebulizer daily. She never previously had to take these medications. Since leaving her employment at the elementary school in Fair Grove, Claimant reported she used her rescue inhaler "very infrequently."

Employer arranged with Sunbelt Environmental Services, Inc. ("Sunbelt"), for air-quality testing to be conducted at the school. Air samples were taken, and remediation efforts based upon sample results were undertaken by the school. In January 2002, rooms LL1 and LL2 (Claimant's first classroom) were inspected and sampled. Before any remediation efforts, airborne spore levels in rooms LL1 and LL2 were very low and similar to the number of spores detected in the outside air. Under a portion of shelving on the north end of room LL2, wet carpet was removed. This was determined to have been a source for mold growth in the wood shelves and cabinets. An HVAC closet and wood paneling were also removed, the area was HEPA-vacuumed, and surfaces were bleached.

In room LL1, workers removed shelving, an HVAC closet, and floor tile. A cabinet housing a sink and a hot water heater was removed, after which a water leak was detected in the line from the hot water heater to the faucet, which had resulted in water damage and mold growth on the back and underside of the cabinet. This leak apparently seeped into room LL3, affecting a cabinet in that room which was removed, and a new cabinet was installed after the area was cleaned with bleach. Carpeting in rooms LL3 and LL4 was removed and replaced with floor tile. Between January 25 and February 20, 2002, Sunbelt conducted environmental sampling on five occasions: three samples were obtained before remediation efforts; four samples following remediation; and five outdoor air control samples were taken. Sunbelt concluded that "the sample results did not indicate active fungal amplification in the areas tested."

Employer continued having Sunbelt sample the air in the building after school was dismissed for the summer vacation at the end of the 2001–2002 term. Samples taken on May 31, 2002, from room LL4 revealed mold counts lower than those in the outside air. Samples taken again on June 21, 2002 revealed a greater presence indoors of "Penicillium" and "Sporotrichum" in Room LL3, and "Penicillium and Geotrichum" in Room LL4. A low level of Aspergillum was detected in Room LL4.[1] In August 2002, further air testing revealed that all levels were less than what was detected in the outside air. In September, Room LL1 contained a low level of "Stachybotrys," and Room LL4 contained a low level of "Drechslera."

Claimant consulted with James L. Hargis, M.D., on May 1, 2002. Dr. Hargis' report to Dr. Ellis indicates he was with the Department of Pulmonary at St. John's Physicians and Clinic in Springfield, Missouri. Dr. Hargis noted that Claimant's chest x-ray was normal and

---

1. The report from Sunbelt states that the air sampling method utilized by Sunbelt in its air testing of the school "does not allow for differentiation between Aspergillus and Penicillium spores because of the size and similar appearance of the spores. In addition, amerospores are small spherical spores that may be Aspergillus, Penicillium, or Trichoderma types, but cannot be readily identified."

"pulmonary functions from March 27 are normal." Another pulmonary function test was performed on May 1, after Claimant had been off medications for a week, and Dr. Hargis stated that pulmonary functions "remain totally normal, and actually better than the pulmonary functions obtained on March 27." Dr. Hargis reported that he saw no evidence of asthma. He further stated that he did not think she had "any hypersensitivity pneumonitis." He recommended she undergo a methacholine challenge and return for results. A subsequent "methacholine provocation test" revealed: "Patient's baseline spirometry is normal. Patient proceeded through the test inhaling maximum doses of methacholine of 10 mg/ml. At the maximum dose the FEV1 dropped by only 11%." Dr. Hargis interpreted this result as a "[n]egative methacholine provocation test."

Gregory K. Lux, M.D. saw Claimant on May 30, 2002, for an allergy evaluation. He noted results from an environmental survey at the school were "unremarkable." Dr. Lux reported that a nasal exam indicated a "mild degree of congestion with mucus stranding." No nasal polyps were observed, and he found no evidence of a secondary infection. Claimant's chest exam was clear. Dr. Lux recommended a methacholine challenge and suggested she undergo a "CT sinuscopy and/or radiographic investigation of the chest in order to delineate any chronic respiratory illness that could occur from her occupational exposure." A subsequent appointment as suggested by Dr. Lux was scheduled for July 11, 2002, which Claimant did not keep. According to Dr. Lux' records Claimant called on July 16, 2002, and cancelled her missed appointment; the notation stating, "status 'doing fine.'"

Claimant filed her claim for worker compensation benefits on or about July 1, 2002.

Employer submitted deposition testimony from Gerald R. Kerby, M.D. Dr. Kerby's sub-specialty is pulmonary disease. At Employer's request, Dr. Kerby examined Claimant in February 2003. In addition to a physical exam, Dr. Kerby reviewed chest x-rays, previous pulmonary evaluations, an allergy evaluation, and records from the environmental sampling conducted by Sunbelt at the school. Claimant reported to Dr. Kerby symptoms of shortness of breath, tightness in her chest, and stated she felt as if she was unable to get enough air.

Dr. Kerby noted that the air samples taken from the school before and after abatement indicated that the levels found inside the building were lower than levels of similar mold detected in the outside air. Dr. Kerby stated that humans are genetically predisposed to develop antibodies against environmental antigens, such as mold. Sensitization occurs when a person develops an allergy to a mold or when they're exposed to very high levels which results in disease. A person who has become sensitized to a mold develops antibodies against the mold to which they are hypersensitive or allergic. Antibodies are either of an "IgE class" or "IgG class." IgE class antibodies can be determined either by skin testing or by blood testing, and reactions generally manifest as upper or lower respiratory allergies, targeting either the nose (diagnosed as allergic rhinitis) or lungs (diagnosed as asthma). IgG class antibodies are usually detected by blood testing. With IgG class antibodies, the associated disease usually acquired through inhalation of the mold is "hypersensitivity pneumonitis,"[2] an "inflammatory process at the level of the small airways

**2.** Dr. Kerby also referred to this disease as "allergic alveolitis."

and the alveoli[.]" This is a restrictive lung disease, whereas asthma is an obstructive disease, and is associated with substantial bronchial hyperactivity.

Dr. Kerby testified that Claimant's skin test for IgE class antibodies was negative, except for a small reaction to Hormodendrum. Dr. Kerby did not believe Hormodendrum was detected in the air samples taken from the school. Dr. Kerby testified that Claimant had no indication of asthma, other than a "borderline bronchial hyperactivity, which is probably not asthma."

Dr. Kerby also stated that restrictive lung diseases such as hypersensitivity pneumonitis are diagnosed by chest x-rays and pulmonary function tests, and then the diagnosis is confirmed or supported by a presence of IgG antibodies against the offending antigen. However in Claimant's case, Dr. Kerby testified, her chest x-rays were normal, and Claimant had "no pulmonary function abnormalities of the type seen with hypersensitive pneumonitis." In reference to Claimant's positive test for IgG antibodies [3] for Aspergillus niger, Dr. Kerby stated:

Aspergillus niger is a ubiquitous fungus, it's everywhere. I mean, it's here, I'm sure. And the presence of IgG antibodies only is an index of some exposure to Aspergillus somewhere in the environment. In order to cause—to determine disease you have to show evidence of disease in association with antibodies against a potential inhaled antigen.

Dr. Kerby's report opined that Claimant "probably had an acute inflammatory bronchitis in ... 2001 which was most likely viral in nature." Because Claimant's pulmonary function studies were presently normal, as was her chest exam and chest x-ray, her description of her current symptoms suggested hypoventilation.

Oscar A. Schwartz, M.D., testified via deposition on behalf of Claimant. Dr. Schwartz practiced "respiratory pulmonary medicine as well as sleep medicine." Dr. Schwartz examined Claimant on October 27, 2003. At that time, she reported the following symptoms: a prolonged cough which "appears to resolve during the weekend," sinus problems, eyes watering, fatigue, and shortness of breath, particularly when active. He noted that Claimant attributed her symptoms to a compromise in the air flow and flooding and standing water in her classroom environment.

Upon examination, Dr. Schwartz noted that Claimant's lungs were clear; she had "some nasal concerns," particularly constant sniffling and congestion; redness in mucous membranes; and mild irritation in the lining of her eyes. Dr. Schwartz recommended she undergo a "RAST specific allergy test" to test for simple allergies. The results from this test did not indicate that Claimant had a simple, i.e., IgE mediated, allergy.

Dr. Schwartz also recommended an "allergic bronchopulmonary aspergillosis panel," in order to detect any reaction to fungi which cause a systemic reaction, such as respiratory problems, even fever and

3. For ease of presentation we have attempted to introduce medical testimony in this opinion in the same chronological order as that encountered by Claimant. Because of references by Dr. Kerby to allergy test results ordered by Dr. Schwartz, an astute reader may question whether on the date Dr. Kerby saw Claimant in February 2003, he had these test results available to him in addition to Dr.

Lux' evaluation. He did not, because those tests were not performed until after Claimant was initially examined by Dr. Schwartz over eight months later on October 27, 2003, *infra*. However, the results of the tests ordered by Dr. Schwartz were made available to Dr. Kerby prior to his deposition being taken on August 16, 2005.

pneumonia. This testing revealed that Claimant was allergic to Aspergillus niger, which Dr. Schwartz noted, is a very common mold associated with the decomposition of organic material, including plants and paper. Dr. Schwartz stated that the presence of Aspergillus niger was found in two of the bulk samples Claimant obtained from the school building, specifically from the air intake vent in LL4, according to a culture analysis report of October 3, 2003. There was also evidence that the same mold was found on a dry erase board in room LL2.

Dr. Schwartz explained that Claimant's sensitivity to Aspergillus niger involves what he termed an "IgG reaction," which is a more systemic reaction than those associated with a simple allergy (these he described as eliciting an "IgE mediated response"). An IgE mediated response is one that comes and goes. An IgG reaction results in permanent sensitization when exposed. According to Dr. Schwartz, once an individual has had such a reaction to a particular fungus, even one which may not have caused a reaction after prior exposures, re-exposure can cause progressively more severe reactions, and it is recommended that the individual avoid subsequent exposures. Dr. Schwartz contends there is a "memory" associated with this type of reaction, triggering symptoms, sometimes more severe, upon re-exposure to the antigen.

In his evaluation, Dr. Schwartz reviewed reports from Dr. Ellis, St. John's Southwest Medical, St. John's Physicians and Clinics, Global Environmental Laboratories, Clinical Pathology Laboratories, and a spirometry from his evaluation. Dr. Schwartz stated that a diagnosis of sensitization "incorporates both the history, the environmental survey as well as the blood work, so it's a combination of everything." Dr. Schwartz concluded that "[t]here appears to be a temporal causation with exposure to the [classroom]."

Dr. Schwartz also provided a written report on his evaluation of Claimant, in which he stated:

Her consolation [sic] of symptoms is consistent with Organic Dust Toxic Syndrome producing mucus membrane irritation, nasal stuffiness, rhinorrhea, cough, rhinitis as well as perhaps eye irritation at the time of the exposure. Agents listed are noted to include Aspergillus, Penicillium, as well as other species that may be implicated in the development of a [sic] Organic Toxic Exposure Syndrome.

Claimant also offered medical records from physician Tina Ward, M.D., who apparently began treating Claimant in February 2004. Claimant complained of migraine headaches, allergies, and fatigue. Dr. Ward noted: "Unclear whether truly has asthma or just allergies and reaction to mold in past."

Mark A. Lichtenfeld, M.D., was deposed on behalf of Claimant. Dr. Lichtenfeld was asked to evaluate Claimant in September 2004, "for allergies and to determine whether she had occupational asthma or became sensitized to mold" during her employment with the school district. Dr. Lichtenfeld testified that Claimant reported watering and itching eyes, nasal drainage, nocturnal coughing, shortness of breath while ambulatory, and wheezing. Although Claimant reported improvement in her symptoms while away from the school building, after leaving her employment, Claimant continued to remain symptomatic with respect to her allergy and respiratory symptoms. She began using a nebulizer with albuterol. While describing conditions in her work environment, Claimant advised Dr. Lichtenfeld that when cleaning crews "sprayed bleach in her room," she developed "paroxysms of coughing, as well

as shortness of breath." Dr. Lichtenfeld testified that he reviewed medical records from other treating physicians, considered the history as reported by Claimant, and reviewed the reports from Global Environmental Laboratories and Sunbelt.

Dr. Lichtenfeld testified that results of a methacholine challenge test performed at the direction of Dr. Kerby, indicated a 28% drop in Claimant's "forced vital capacity," which he defined as "basically a measure of how much air the lungs can hold." In laymen's terms, this measurement equals a drop from 3 liters to less than 2 liters. He stated the significance of this measurement "shows that [Claimant] is definitely sensitized to an allergen" and signifies "reactive airway disease." Reactive airway disease causes difficulty exhaling, but not inhaling, because air is trapped in the microstructures of the lung and is difficult to expel. Dr. Lichtenfeld noted the results of a positive immune screen obtained by a blood test, indicating that Claimant "was systematically sensitized to Aspergillus niger[,]" which organism, according to Dr. Lichtenfeld, was isolated in Claimant's workplace but not found in "the ambient environment outside of the school room[.]" Here, Dr. Lichtenfeld refers to the testing of the bulk mold collected by Claimant rather than the testing of the air in the classroom, as conducted by Sunbelt. Dr. Lichtenfeld opined that he was not sure that Sunbelt actually tested for Aspergillus niger, as the report contained no indication of whether the allergen was present or absent. He further stated that "it does not appear that she was tested for the mold to which she was exposed at her school."

A systemic allergy, he testified, involves a full-body reaction affecting the cardiorespiratory system, which affects Claimant's ability to breathe. Dr. Lichtenfeld also diagnosed Claimant with occupational asthma, as well as allergic rhinitis and conjunctivitis, which he believed were occupationally induced. He stated that "[t]he substantial cause of these diagnoses was the mold exposure at [Claimant's] workplace while she worked for Fair Grove Elementary School in 2001 and 2002." He further opined that Claimant "has a 27–1/2 percent permanent partial disability of the person as a whole."

Pamela Herd, a fellow second-grade teacher at the elementary school, testified on Claimant's behalf. She also left Employer following the 2001–2002 school year. Ms. Herd testified that prior to school beginning in August 2000, she detected "a very strong odor" when she entered the building to prepare her classroom for the start of school. The carpet in her classroom was wet, and fans had been placed there to help dry the carpet following flooding. The base walls of her classroom were constructed of cinder block, and there was paneling along at least one wall. A water mark was visible six to eight inches above the floor on the paneled east wall. Carpeting was replaced with linoleum prior to the start of school that year. In January 2001, she was relocated to a classroom across the hall.

During the 2001–2002 school year, Ms. Herd was first assigned to room LL1. She moved to room LL2 in December or January. Ms. Herd testified that while she occupied the classrooms on the lower level, she noticed mold primarily on the bottoms of book cases and books on the lower shelving. In late January or February 2001, the classroom designated LL1 was sealed after attempts were made to clean the room. Books and materials that had been contained in that classroom were moved out and stored elsewhere. Ms. Herd testified that she vacuumed the materials and wiped them down, but the items still felt "very gritty." Teaching

materials that she removed from that classroom were eventually destroyed, and Ms. Herd was reimbursed by Employer.

Ms. Herd testified to a time when Claimant and she were working together in room LL2, and Claimant had to leave to get her inhaler because she could not breathe. Ms. Herd testified to developing sores on the outer edge of her nose and problems with her menstrual cycle, which began in the fall of 2001. After she was moved from that level and away from the building for the summer, she no longer had these complaints. Ms. Herd also stated that she had a chronic asthmatic student who had to be admitted to the hospital during the time her class occupied room LL1, and the child's symptoms improved after moving from that room. Another parent had requested that a student be moved upstairs because the child was experiencing more illnesses than in previous years.

Another former teacher, Diana Horton, with whom Claimant worked while employed at the Fair Grove district, taught at Fair Grove from 1971 until she retired in 2004. Ms. Horton testified that her classroom was located in the then newly constructed, lower-level addition comprised only of rooms LL1 and LL2, which was originally called the basement. Early into the first year the addition was occupied, rain flooded that section. Subsequent rains also resulted in flooding, but not to the extent as the first instance. Ms. Horton was assigned to room LL2, which was carpeted. When the classroom flooded, she was often forced to move to a different location while fans were utilized to dry the carpet. When the carpet dried, she would move her class back into room LL2. This occurred "easily four or more" times.

Ms. Horton testified to the construction undertaken by the school to remedy the problems with flooding in the addition. When it was determined that wet weather springs were located under the foundation of the addition, the wall between the addition and the original building was "ripped out," and canals and drains were constructed between the original building and the addition along the entire width of the building, from west to east. Ms. Horton testified that the canal was at least three-and-a-half to four feet tall in some places. Interior walls in the addition were reconstructed with the canal between them and the original building, after which, rooms LL1 and LL2 had ledges along that wall. Wooden cabinetry was re-installed over the old carpeting. After this construction, Ms. Horton testified, it never flooded to a major degree again, however, after heavy rain, water would leak in around windows where the rainwater pooled outside the building because of the steep slope of the ground. Ms. Horton stated it didn't take a lot of rain for the windows to leak, as the classroom was basically ground level.

Although the flooding issues subsided, Ms. Horton stated that she "always had mold issues in LL2." Ms. Horton further stated that she kept her books and supplies in open shelving and did not have a mold problem with them, although they had a musty odor. However, as to the kindergarten rest mats which were stored in the cabinet area, she "would always have to wash them down because they had visible mold on them."

In 1996, rooms LL3 and LL4 were constructed, extending the addition built in 1971. Although Ms. Horton could not recall heavy flooding after the construction, room LL3 experienced problems with large water spots in the middle the carpeting. She relocated her classroom to room LL4 in 1996, after which there was only one instance of water leaking around a window and onto the carpeting. However, she encountered further problems with

mold developing under her desk, which sat on a tiled floor over concrete. The desk eventually had to be discarded after she became ill.[4]

During the first few months of the 2001–2002 school year, Ms. Horton's and Claimant's classrooms were side by side. In May 2002, Ms. Horton first experienced health problems and became ill. She testified that at the onset, she could not do anything other than sit; she could not move or do an activity. When she saw the school nurse, she was told she needed an inhaler and should go to a doctor that day. Ms. Horton testified, "I just had no breath." She had never experienced any breathing problems prior to that time, had exercised at least five mornings per week, walking three miles every morning, and was an avid hiker in Colorado. The previous three years, she "had started doing 14ers."[5] Ms. Horton, who was then 52 years old, described herself as being "in great shape." After the onset of her health problem, Ms. Horton testified to a time when she assisted in taking students on a tour of the Wonders of Wildlife Museum, and when she walked up a flight of stairs, she experienced extreme chest pain and could not breathe.

In the summer of 2002, Ms. Horton sought medical care. She was diagnosed with allergies to grasses and molds. She was prescribed Albuterol, a rescue inhaler, and antihistamines. When symptoms did not improve, she was referred to new doctors. She returned for the fall 2002 start of school and relocated her classroom to an upper level. Afterward, the extreme chest pain "and the horrible rattle that would go all the way up and down [her] chest" subsided, but her peak flow [breathing] levels dropped soon after the start of school. By January and February, she became "really ill." At that point, she was taking eight medications. Ms. Horton ended her employment in 2004.

On cross-examination, Ms. Horton stated that allergy test results indicated that she was allergic to Bermuda grass, in addition to ragweed and juniper trees. During redirect, Ms. Horton stated she had never experienced any reaction to exposure to grasses, ragweed, or juniper trees prior to her exposure to the mold in May 2002.

Dr. Timothy McNichols, whose specialty is internal medicine, was deposed in May 2006, in regard to Ms. Horton's workers' compensation claim. His deposition was admitted by Claimant as Exhibit J. Dr. McNichols had been treating Ms. Horton since January 2001. In May 2002, he saw Ms. Horton for complaints related to shortness of breath, wheezing, coughing, and "swimmy headed[ness]." Dr. McNichols observed that the onset was "fairly acute," as Ms. Horton had never reported similar symptoms prior to then. Dr. McNichols testified the only pre-existing condition might have been hay fever, of which she complained in January 2002. Dr. McNichols first believed he was "dealing with an allergic asthma . . ., possibly brought on from mold in her school." Dr. McNichols continued to treat Ms. Horton for allergic asthma, and believed that her improvement after use of the "bronchodilator" indicated there was, in fact, a pulmonary problem. Dr. McNichols consulted with Dr. Terry Coulter, a pulmonologist, who concurred with his assessment that Ms. Horton's asthma was a reaction to an allergen. Claimant's symptomology and the onset of her condition, in addition to having treated four other teachers from

---

4. Horton has a workers' compensation claim currently pending against Employer.

5. Horton did not elaborate on the definition of a "14er," and the record does not disclose the definition.

the school with similar complaints, indicated to him that exposure to toxins or allergic substances at her school was the cause of her allergic asthma.

Dr. McNichols stated that testing for molds and fungi was "in an early state of development." No standards for judging acceptable or tolerable exposures are yet established. However, Dr. McNichols testified that his research revealed that "allergies are the type of diseases most often associated with molds," and if one who is susceptible to mold is exposed, "there is a potential health risk." Dr. McNichols stated that "this is a field in its infancy."

Dr. McNichols diagnosed Horton with "allergic asthma" from her exposure to her workplace. He reported that he treated four women exposed at the Fair Grove school, and all had similar findings. He opined that "this is more than coincidental."

Upon a finding that Claimant's condition was not compensable under Chapter 287, the ALJ denied Claimant benefits. Claimant applied to the Labor and Industrial Relations Commission ("Commission") for review.

Initially upon the Commission's review, Commissioner Ringer declined any involvement or participation due to his previous employment with Evans and Dixon, the law firm representing Employer, while this case was being defended by that firm. Denying any actual knowledge of the case, Commissioner Ringer still took this action to avoid the "appearance of impropriety because of [his] previous status with the law firm[.]" Upon oral argument, Employer's counsel described Commissioner Ringer's involvement with the case while at Evans and Dixon as follows:

> [Employer's Counsel]: [A]nd as I remember it, it was in late 2002, when Commissioner Ringer was a member of our department in Kansas City, I was

talking to him about different doctors that would be used in different types of cases, and I ended up using that advice in this case. At no time during that conversation did I mention the Deann Henley case, so he would have no specific knowledge about this case.

> [Question from the bench]: So he's the one that recommended Dr. Kerby?

> [Employer's Counsel]: Dr. Kerby's name came up during that conversation. Uh—and, uh—but uh, as I say, Commissioner Ringer had no specific information about this case and didn't know the case name ...

However, following Commissioner Ringer's initial refusal to participate in the case, Commissioner Bartlett voted to affirm the decision of the ALJ and Commissioner Hickey voted to reverse it, creating a deadlock. As a result, and citing the rule of necessity as discussed in *Barker v. Secretary of State's Office*, 752 S.W.2d 437 (Mo.App.1988), Commissioner Ringer felt compelled to participate in the case "because there is no other mechanism in place to resolve the issues in the claim." He concurred in the opinion of Commissioner Bartlett affirming the ALJ's decision denying Claimant benefits. Claimant's appeal followed.

### *Standard of Review*

■ Where, as here, the Commission attaches and incorporates by reference the award and decision of the ALJ, this court considers the findings and conclusions of the Commission as including the ALJ's award. *Kuykendall v. Gates Rubber Co.*, 207 S.W.3d 694, 702 (Mo.App.2006). The Commission's award is reviewed only on questions of law, and the Court may modify, reverse, remand for rehearing or set aside the award only upon one or more of the following grounds: (1) that the Com-

mission acted without or in excess of its power; (2) that the award was procured by fraud; (3) that the facts found by the Commission do not support the award; (4) that there was not sufficient, competent evidence in the record to warrant the making of the award. *Id.;* Section 287.495.1.[6] As to the fourth ground: "A court must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence." *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 222–23 (Mo. banc 2003). "This standard would not be met in the rare case when the award is contrary to the overwhelming weight of the evidence." *Id.*

### Discussion

Claimant asserts two points of Commission error. For ease of analysis, we discuss them in the reverse order of that presented by Claimant in her brief.

### Commissioner Ringer was Required to Participate and Vote

Claimant's second point asserts that the Commission erred in denying her compensation because it "was the result of the improper and unconstitutional vote of a member of the Commission who actively participated in the defense of the case[.]" While Claimant's point relied on posits error by the Commission for the participation and vote of Commissioner Ringer, her argument in her brief and her counsel at oral argument concede that his participation and vote was required by the rule of necessity, as discussed in *Barker v. Secretary of State,* 752 S.W.2d 437 (Mo. App.1988). This is so because as recognized by Claimant in her brief, "there exists no substitute Commissioner to cast the

deciding vote on this review[,]" and as recognized in *Barker,* "[t]here is no other mechanism for review available, thus when a deadlock occurs between two members of the Commission, the rule of necessity applies to allow the third member to participate and break the tie even in face of this member's bias." *Id.* at 441. Therefore, Claimant's second point is denied.

Nevertheless, Claimant urges and requests that the present case be reviewed, as suggested in *Barker,* "with special intensity, and the record and circumstances thoroughly examined to determine if any injustice has been done." *Id.* at 441. While our colleagues on the Western District of this court in *Barker* failed to clearly delineate the precise boundaries of such "special intensity" and exactly how it differs from the intensity usually given in all other cases before our court, they did explicitly limit it, stating: "The heightened scrutiny with which we review this case does not mean, however, that we are undertaking a de novo review. Our scope of review is rigidly prescribed by statute and we will not stray out of the perimeters set for us by the legislature." *Id.* It is within that scope of review, as set forth *supra,* that we have proceeded in the case at bar, with as thorough a review of the record as we could muster and with as critical an eye as our cognitive abilities allow. *See id.*

### Claimant Failed to Prove Causation

■ In her first point, Claimant states:

The [Commission] erred by holding that [Claimant's] mold allergy was due to exposure to mold outside of the classroom when there existed no testimony or evidence indicating anything other than occupational exposure. Additionally, the [Commission] erred by holding

---

**6.** All references to statutes are to RSMo 2000, and all references to rules are to Missouri Court Rules (2007), unless otherwise indicated.

[Claimant] to a higher burden of proof by concluding that the [Claimant] must not only prove that her exposure to mold in the classroom was "a substantial factor" but also that there existed no other conditions that could also have been factors outside of her work exposure.

Unfortunately, Claimant's point convolutes the findings and conclusions issued by the Commission. Claimant has not directed us to, and we have not found anything in the award that constitutes a holding by the Commission to the effect "that [Claimant's] mold allergy was due to exposure to mold outside of the classroom[,]" or as placing any additional burden upon Claimant to also prove "that there existed no other conditions that could also have been factors outside of her work exposure," as Claimant contends.[7]

As best we can discern, Claimant is challenging the Commission's conclusion that "[c]laimant's condition is not work related[,]" because it is not supported by sufficient competent and substantial evidence from the record as a whole, as a result of the Commission holding Claimant to a higher burden of proof than that required by section 287.020, in that the Commission stated that "Claimant could have been exposed to Aspergillus Niger at any number of locations and any exposure could have been sufficient to cause her condition[,]" and "[t]he simultaneous presence of some mold in a building and an increase in physical complaints among some of its inhabitants is hardly proof that the mold is a substantial factor in the cause of the complaints," when, as stated in Claimant's argument, "there existed no testimony or evidence that [Claimant] was ever exposed

to Aspergillus Niger anywhere other than in her classrooms."

■ Under the pre–2005 standard of causation, pursuant to section 287.020 as referenced by section 287.067.2, a claimant has the burden of proving that work was a "substantial factor" in causing an occupational disease. *See Lawson v. Ford Mtr. Co.*, 217 S.W.3d 345 (Mo.App.2007). In order to support an award in a claimant's favor "[g]enerally, a claimant's medical expert in an occupational disease case must establish the probability that the disease was caused by conditions in the work place[,]" and "[t]here must be medical evidence of a direct causal connection between the conditions under which the work is performed and the occupational disease." *Dawson v. Associated Electric*, 885 S.W.2d 712, 716 (Mo.App.1994), *overruled on other grounds by Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 228 (Mo. banc 2003). Moreover, an occupational disease does not arise out of or in the course of employment if it comes "from a hazard or risk unrelated to the employment to which workers would have been equally exposed outside of and unrelated to the employment in normal nonemployment life." Section 287.020.3(2)(d), as applied by reference in section 287.067.2.

Claimant's argument initially fails on its face because her premise that "there existed no testimony or evidence that [Claimant] was ever exposed to Aspergillus Niger anywhere other than in her classrooms[,]" is explicitly refuted by the record. Dr. Kerby testified that: "Aspergillus niger is a ubiquitous [8] fungus, it's everywhere." Claimant's own expert, Dr. Schwartz, tended to support this fact, stating that Asper-

**7.** Claimant failed to support her argument on this point with any citations to the legal file or transcript, as required by Rule 84.04(i). *See In re Marriage of Fritz,* 243 S.W.3d 484, 488 (Mo.App.2007); *Bishop v. Metro Restoration*

*Services, Inc.,* 209 S.W.3d 43, 46 (Mo.App. 2006).

**8.** Ubiquitous is defined as: "existing or being everywhere at the same time: constantly en-

gillus niger is "a very common mold." If Dr. Kerby is correct, and the Commission specifically found Dr. Kerby to be credible, then a reasonable inference, actually the only inference that can be drawn, is that Claimant has been exposed to Aspergillus niger everywhere she has ever been, which would include "anywhere other than in her classrooms."

Nevertheless, Claimant argues that even if she "was exposed to mold outside of the . . . classroom, the [Commission] erred by concluding that such exposure would be enough to defeat the [*Claimant's*] *evidence* that her exposure at work was 'a substantial factor' in bringing about her condition." (Emphasis added). This argument is premised upon the assumption that the Commission was limited to considering only Claimant's evidence on the issue of causation, which it was not. *See* section 287.480.1 (Commission "shall review the evidence"). Claimant's reliance upon this erroneous assumption is demonstrated by her almost total failure to address the testimony of Dr. Kerby in the argument portion of her brief on this point.[9] Nowhere in her brief does Claimant argue that Dr. Kerby's testimony is not supported by substantial and competent evidence in the record.

Dr. Kerby testified that the body develops antibodies "[w]hen exposed usually to higher than usual concentrations of the inhaled [allergen]." Dr. Kerby could not quantify what constituted "higher than usual concentrations." However, in this regard, he testified that "you look for evidence of environmental amplification of molds, which means that you have higher levels of mold in the indoor environment than you do outdoors." In Claimant's case, he found "no evidence that she was exposed to a concentration of the mold in the school that was even as high" as that to which she was exposed outside or at home; thus, he said, "there's nothing to support the development of sensitization to molds in the school." The Commission determined and found this opinion credible.

In this determination, the Commission also considered environmental testing results and medical records of Dr. Gregory Lux, which referenced environmental samples taken at the school that "produced relatively unremarkable results because the mold content of the indoor spaces was less than similar cultures obtained outside of the school rooms with an ambient environmental survey."

Dr. Kerby further testified that when sufficient exposure to inhaled antigens occurs, "the body develops antibodies, either the IgE class or IgG class. And when those then interact with a subsequent inhalation of the mold, if it's the offending antigen, then disease is produced." Dr. Schwartz, one of Claimant's experts, testified similarly. However, Dr. Kerby and Dr. Schwartz differed as to the disease mechanism associated with that sensitization.

Dr. Kerby testified that hypersensitivity pneumonitis is the disease associated with the presence of IgG antibodies to Aspergillus niger, and that Claimant exhibited no symptoms of that disease, as "her chest x-

---

countered: WIDESPREAD." MERRIAM-WEB-STER'S 11TH COLLEGIATE DICTIONARY.

9. Claimant's only reference to Dr. Kerby's testimony in her argument is found on page 41 of her brief, where she states: "Although the employer's doctor, Dr. Kerby, disputes whether the work exposure was of high enough mold count, the doctor does agree that the exposure to mold would certainly be the proximate cause of a person developing an IgG mediated mold allergy." Indeed, the facts relied upon by Claimant in the argument portion of her brief consist entirely of a recitation of her evidence in the light most favorable to her claim, totally ignoring any contrary evidence.

ray was always reported as normal, pulmonary function was always reported as normal."[10] Likewise, Dr. Hargis, Claimant's treating pulmonologist, reported that he did not believe Claimant had "any hypersensitivity pneumonitis."

Claimant's medical evidence of work-related causation of her condition was presented by way of Dr. Schwartz and Dr. Lichtenfeld. Dr. Schwartz testified that Claimant's exposure to the presence of Aspergillus niger in the school building (as demonstrated by bulk samples obtained by Claimant), regardless of the concentration of the mold present, resulted in a permanent sensitization to the allergen such that any re-exposure would trigger a systemic reaction. Dr. Schwartz further maintained that "[t]he amount of exposure [to the mold] does not indicate whether or not you will be sensitized[.]"

The disease diagnosed by Dr. Schwartz as a result of that sensitization, however, is not clear. His written report indicated that Claimant suffered from what he described in one place as "Organic Dust Toxic Syndrome" and in another place, within the same paragraph, as "Organic Toxic Exposure Syndrome." However, Dr. Schwartz never identified in his report or his testimony the objective symptoms which would support a diagnosis of either of these stated diseases. In his testimony, he stated that the conditions in Claimant's workplace, the presence of Aspergillus niger in her environment at school, the exacerbation of symptoms when she returned to the classroom, and the presence of the IgG antibody in Claimant's blood test indicated that Claimant experienced a systemic reaction and that Claimant had become sensitized. However, he failed to explain in his testimony how this sensitization produced or caused any disease in Claimant.

Claimant's other expert, Dr. Lichtenfeld, offered a different disease diagnosis than Dr. Schwartz. While he acknowledged Claimant's sensitization to Aspergillus niger, as indicated by her IgG mediated response, he diagnosed her with occupational asthma and allergic rhinitis with conjunctivitis. However, this diagnosis was disputed by Dr. Kerby in two ways. First, Claimant did not have any objective symptoms associated with either disease. This opinion was supported by Dr. Hargis, Claimant's treating pulmonologist, in his report dated May 1, 2002, and by Dr. Ward, Claimant's treating physician, in her notes in February 2004. Second, and most significant to the issue of causation, Dr. Kerby testified that asthma and allergic rhinitis are the diseases associated with an IgE mediated response to a mold. Thus, because Claimant had an IgG mediated response to Aspergillus niger, even if Claimant had asthma or allergic rhinitis, it was not caused by exposure to Aspergillus niger.

Dr. Kerby attributed the causation of Claimant's condition to "an acute inflammatory bronchitis in ... 2001 which was most likely viral in nature[,]" and which slowly subsided. This diagnosis is consistent with Dr. Ellis' initial impression in November 2001, that Claimant's symptoms gave the appearance of "viral bronchitis." Dr. Kerby also indicated that Claimant's current symptoms suggested hypoventilation. There was no evidence that either of these conditions were caused by an IgG mediated response to Aspergillus Niger.

---

**10.** Dr. Kerby further testified that he found no evidence of a physical response associated with IgE antibodies, which might indicate an obstructive problem, such as allergic rhinitis or asthma. However, Claimant does not argue in her brief that she has a condition as a result from exposure to any mold other than an IgG mediated response to Aspergillums Niger. Thus, we need not address the diseases of allergic rhinitis or asthma which, according to Dr. Kerby are associated with an IgE mediated response to some other mold.

 "[T]he Commission is the ultimate trier of fact." *George v. City of St. Louis,* 162 S.W.3d 26, 30 (Mo.App.2005). In regard to causation and work-relatedness, these are questions of fact solely for the Commission's determination. *Royal v. Advantica Restaurant Group, Inc.,* 194 S.W.3d 371, 376 (Mo.App.2006). Attributing Claimant's condition "to the hazards of everyday life or to a risk or hazard inherent in her work conditions depended upon the acceptance or rejection of conflicting medical opinions or theories." *See Dawson,* 885 S.W.2d at 715. Accepting or rejecting medical evidence is the duty of the Commission. *Lawson,* 217 S.W.3d at 350. *See also Russell,* 174 S.W.3d at 23.

 Section 287.067.1 "requires that the condition be an identifiable disease arising with or without human fault and in the course of the employment." *Kent v. Goodyear Tire & Rubber Co.,* 147 S.W.3d 865, 867 (Mo.App.2004). A determination of whether Claimant developed an occupational disease is "an issue peculiarly for the Commission's determination[,]" *Dawson,* 885 S.W.2d at 715, and deciding "what weight it will accord expert testimony on matters relating to medical causation lies within the Commission's sole discretion and cannot be reviewed by this court." *Aldridge v. Southern Mo. Gas Co.,* 131 S.W.3d 876, 882 (Mo.App.2004). The occupational disease may be compensable if it is *"clearly* work related[.]" *Jacobs v. City of Jefferson,* 991 S.W.2d 693, 698 (Mo.App. 1999), *overruled on other grounds by Hampton,* 121 S.W.3d at 226; Section 287.067.2. The Commission concluded that "Claimant's condition is not work related." This finding and conclusion is well within the Commission's discretion to determine what weight it accords expert tes

timony on medical causation and is supported by the testimony of Dr. Kerby and Dr. Hargis.

 Upon review of an award by the Commission, this court is limited to a determination of whether sufficient competent evidence warrants the award, whether the Commission acted in excess of its powers, whether the award was procured by fraud, or whether the facts found by the Commission support the award. Section 287.495.1. "It is not the function of an appellate court to decide afresh what weight ought to be given to conflicting medical opinions on causation." *Roberts v. Mo. Hwy. & Transp. Comm'n,* 222 S.W.3d 322, 333–34 (Mo.App.2007). It is "up to the Commission, not this court, to decide which of the two lines of expert reasoning was more credible as to causation." *Kent,* 147 S.W.3d at 871. "Where competent evidence or permissible inferences conflict, 'the choice rests with the Commission and is binding upon this court.'" *Clayton v. Langco Tool & Plastics, Inc.,* 221 S.W.3d 490, 493 (Mo.App.2007) (quoting *Montgomery v. Mo. Dept. of Corrections and Human Resources,* 849 S.W.2d 267, 271 (Mo. App.1993)). This court will uphold a finding of the Commission which is consistent with either of two conflicting medical opinions if the finding is supported by competent and substantial evidence and is not against the overwhelming weight of the evidence.[11] *Lawson,* 217 S.W.3d at 350.

 The Commission concluded that Dr. Kerby's testimony, "that there was nothing to support a mold-induced environmental occupation lung disease[,]" was credible. Implicit in this conclusion is the determination that Dr. Lichtenfeld's testimony as to causation was not credible. The Commission explicitly found Dr.

11. As noted in *Barker,* the application of the rule of necessity does not alter our standard of review. *Barker,* 752 S.W.2d at 441. Re

gardless of the intensity of our review, that standard does not allow us to intrude upon the factual determinations made by the Com

Schwartz's testimony as to causation not credible. In addition, where, as here, "the Commission's credibility determinations coincide with the ALJ's—particularly where both have determined the credibility of medical experts from a written record-the resulting consistency is a factor in favor of upholding the Commission's award on appeal." *ABB Power T & D Co. v. Kempker*, 236 S.W.3d 43, 52 (Mo.App. 2007). Dr. Kerby's testimony, which was consistent with and supported by the records of Dr. Ellis, Dr. Hargis, Dr. Ward, and the Sunbelt environmental air samples, along with those records and samples, provided substantial and competent evidence upon the whole record to support the Commission's conclusion that Claimant's condition was not work related and, therefore, not compensable. Point I is denied.

### Decision

The Commission's award denying Claimant compensation is affirmed.

BARNEY, P.J., and RAHMEYER, J., concur.

mission based upon credibility, if the credited witness's testimony is otherwise supported by substantial and competent evidence on the record as a whole. *Lawson*, 217 S.W.3d at 350. In the instant case, there is nothing in the record to indicate that Commissioner Ringer acted in any manner other than as that required of him by the legislative act establishing the Commission and by his appointment as a commissioner. Had he refused to vote in this case, he would have been shirking his statutorily mandated administrative obligation to decide the case and his oath of office to follow the law. While we are quick to note that there is absolutely no evidence of any actual impropriety by Commissioner Ringer in casting his vote in this case, we acknowledge that suggesting a particular expert witness for one party and then later passing upon the credibility of that witness in deciding the case gives rise to the appearance of impropriety. In order to maintain public trust and confidence in the integrity, fairness, and impartiality of the judicial system, the judicial branch of state government has strict rules requiring recusal of a judge based upon such an appearance of impropriety and providing for assignment of another judge to hear and decide the matter. *See* Rule 2.03. Even though *Barker* was decided almost twenty years ago, the legislature has not seen fit to address this public trust issue in the administrative context by providing such a mechanism for commissioners under the Workers' Compensation Act.