Catherine DAWSON, Respondent,

v.

ASSOCIATED ELECTRIC, Appellant.

No. WD 48974.

Missouri Court of Appeals,
Western District.

Aug. 2, 1994.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 4, 1994.

Application to Transfer Denied
Nov. 22, 1994.

Frederick J. Greenbaum, Kansas City, for appellant.

John J. Hager, Kansas City, for respondent.

Before FENNER, P.J., and LOWENSTEIN and SPINDEN, JJ.

FENNER, Presiding Judge.

Catherine Dawson sought workers' compensation benefits as a result of having contracted scleroderma[1] during her employment at Associated Electric Cooperative, Inc. (Associated Electric). Following a hearing, the administrative law judge (ALJ) denied her claim finding that she failed to prove an exposure to hazardous materials causing her scleroderma. The ALJ also found that Dawson failed to prove the medical-causal connection between her employment at Associated Electric and her scleroderma. The Labor and Industrial Relations Commission (Commission) reversed the ALJ and awarded Dawson compensation. It found that Dawson suffered from an occupational disease arising out of and in the course of her employment. Associated Electric appeals the Commission's award. We affirm.

1. Dr. Bridges described "scleroderma" as an immune disease, which involves three components of the body's tissue (the immune system, the blood vessels and the connective tissue fibers).

The record viewed in the light most favorable to the Commission's award shows that Catherine Dawson was employed by Associated Electric in its mining facility located in Clifton Hill, Missouri from June of 1983 to January of 1990. Dawson worked as a laborer for her first two years. As a laborer, Dawson's main duty was to clean up coal. She shoveled coal off the floor onto the conveyor belt. When she worked in the "slot," she was required to use a high pressure hose to push the coal to one end of the "slot" where the drain was located. This required Dawson to stand behind the hose with her back to the exhaust fan while cleaning the coal and moving it toward the drain. This caused the dust to rise from the coal. The exhaust fan then blew the dust across Dawson's face.

In 1985, when Dawson became a repair person, she continued to work in the same area of the plant. As a repair person, Dawson was still required to do clean up work. This included hosing down areas before repairing the equipment. A repair person's job was essentially to "refurbish" the plant.

The area of the plant where Dawson worked was extremely dirty. At the end of the shift, Dawson would be covered with black coal dust from head to toe and even her underwear would be black with coal dust. Dawson also testified that soot would come out of her nose when she blew it.

Dawson's illness became apparent in September of 1989 and has progressively worsened. On January 2, 1990, Dawson was hospitalized in serious condition for approximately fifty days. She has been unable to do her job since that time. Dawson's symptoms consist of swollen and painful hands, problems with her joints, lung and breathing problems, swollen feet and continuous nose bleeds. Dawson has needed an oxygen supplement since February of 1990. She uses the oxygen supplement daily, and can only be without the oxygen supplement for periods of about one hour.

It causes changes in those tissues, leading to skin involvement and other types of organ involvement, including, potentially the lungs, heart and kidneys.

As a result of her condition, Dawson was examined by Dr. Alan Bridges, a rheumatologist, who became Dawson's treating physician. Dr. Bridges specializes in the treatment of scleroderma, particularly when it is related to unusual circumstances such as exposure to toxic agents. He has also treated two coal miners with scleroderma.

Dr. Bridges diagnosed Dawson as having scleroderma with severe involvement of the lungs. An open lung biopsy showed that Dawson also has bronchiolitis obliterans [2] organizing pneumonia (BOOP) and silica particles in her lungs.

At the hearing, Dr. Bridges testified by deposition that there is a strong relationship between silica exposure and scleroderma. Dr. Bridges noted that Dawson had been exposed to silica (from coal dust) in her work environment over a period of years and that her exposure was so bad that she could actually see coal dust in the air. Dr. Bridges testified that because of her line of work, Dawson had a higher exposure to silica than a person who did not have the same employment as she. Dr. Bridges also testified that studies have shown that people that have heavy silica exposure are 10–200 times more likely to have scleroderma than the normal population.

At the hearing, Associated Electric introduced the deposition testimony of Dr. Gerald Kerby who conceded that Dawson had silica present in her lungs and that the presence of silica was related to Dawson's exposure at Associated Electric. However, Dr. Kerby further opined that Dawson's scleroderma was not caused by her employment at Associated Electric.

Associated Electric also introduced the deposition testimony of Dr. Mary Jo Wakeman, an occupational medicine physician. She testified that her research into the association between silica exposure and scleroderma indicated no causative or significantly consistent associative relationship.

The Commission found Dr. Bridges' testimony to be more credible and concluded that Dawson "suffers from an occupational disease arising out of and in the course of her employment which renders her permanently and totally disabled."

In its appeal, Associated Electric raises one point with two subpoints. Associated Electric claims that the Commission erred in awarding Dawson compensation because 1) "scleroderma is not an occupational disease in that there is no recognizable link between the disease scleroderma and some distinctive feature of her job with Associated Electric inasmuch as the etiology of the disease is unknown;" and 2) "scleroderma is not an occupational disease in that there was not sufficient evidence of a direct causal connection between the conditions under which the work is performed and scleroderma as there was no medical testimony that her condition was caused by her employment."

The standard of review is as follows: The Commission is charged not only with reviewing the record but, when appropriate, determining the credibility of witnesses and the weight to be given their testimony, resolving any conflicts in the evidence, and reaching its own conclusions independently of the ALJ's findings. *Jones v. Jefferson City School Dist.*, 801 S.W.2d 486, 489 (Mo.App.1990). After the Commission has determined an award in a workers' compensation case, this court will review the Commission's award and not the findings of the ALJ. *Id.* The Commission's final award may be set aside only if there is no substantial evidence to support it or if it is clearly contrary to the overwhelming weight of the evidence. *Id.* at 488.

This court must view the evidence and legitimate inferences therefrom in the light most favorable to the Commission's award. *Id.* at 488. We will not substitute our judgment on issues of fact for that of the Commission even if we would have made a different initial conclusion. *Lawson v. Emerson Elec. Co.*, 833 S.W.2d 467, 471 (Mo.App. 1992). The Commission is the sole judge of

2. Dr. Bridges described "bronchiolitis obliterans" as a "fibroblastic reaction within the small airways of the lungs, where the lining of the bronchial tubes proliferates and closes off these bronchial tubes and, also, cells are deposited within the air sacks, which cause there to be an abnormality in oxygenation."

witness credibility and the weight and value of the evidence. *Id.* at 470–71.

■ In the case at bar, the issue is whether there is sufficient competent evidence in the record to support the Commission's finding that Dawson suffered a compensable occupational disease under section 287.067.1, RSMo 1986.[3] We find that there was sufficient competent evidence in the record.

Section 287.067.1, RSMo 1986, defines an "occupational disease" as:

[A] disease arising out of and in the course of the employment. Ordinary diseases of life to which the general public is exposed outside of the employment shall not be compensable, except where the diseases follow as an incident of an occupational disease as defined in this section. A disease shall be deemed to arise out of the employment only if there is apparent to the rational mind upon consideration of all the circumstances a direct cuasal [sic] connection between the conditions under which the work is performed and the occupational disease, and which can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment and which can be fairly traced to the employment as the proximate cause, and which does not come from a hazard to which workers would have been equally exposed outside of the employment. The disease must be incidental to the character of the business and not independent of the relation of employer and employee. The disease need not to have been foreseen or expected but after its contraction it must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a rational consequence.

■ The question of whether Dawson has an occupational disease involves a two-step inquiry. First, was there exposure to the disease—(scleroderma)—which was greater than or different from that which affects the public generally. *Jackson v. Risby Pallet & Lumber Co., Inc.*, 736 S.W.2d 575, 578 (Mo. App.1987). Second, was there a recognizable link between scleroderma and some distinctive feature of Dawson's job which is common to all jobs of that sort. *Id.*

The evidence showed that Dawson's work environment exposed her to silica in the form of coal dust in the air. Dawson's uncontradicted testimony showed that for seven years, at the end of each work shift, she would be covered with black coal dust from head to toe. Even her underwear would be black with coal dust. Soot would come out of Dawson's nose when she blew it. Dr. Bridges testified that because of her line of work, Dawson had a higher exposure to silica than a person who did not have the same employment as she. Even Associated Electric's expert, Dr. Kerby, conceded that Dawson had silica present in her lungs and that the presence of silica was related to Dawson's exposure at Associated Electric. Dr. Bridges also testified that exposure to silica is linked to scleroderma. Dr. Bridges testified further that studies have shown that people that have heavy silica exposure versus the normal population are 10–200 times more likely to have scleroderma. Thus, there was sufficient evidence from which the Commission could find that Dawson had an occupational disease. Associated Electric's point must be denied.

■ Finally, throughout its brief, Associated Electric attacks the Commission's decision because the medical evidence in this case demonstrates that the etiology of scleroderma is unknown. However, attribution of Dawson's scleroderma to the hazards of everyday life or to a risk or hazard inherent in her work conditions depended upon the acceptance or rejection of conflicting medical opinions or theories. *Skinner v. Dawson Metal Products*, 575 S.W.2d 935, 943 (Mo. App.1978). Therefore, the question of whether Dawson developed an occupational disease was an issue peculiarly for the Commission's determination. *Id.*

3. Section 287.067.1 was amended in 1993. The amended version, appearing in RSMo Supp. 1993, substituted "unless a different meaning is clearly indicated by the context, an identifiable disease arising with or without human fault" for "a disease arising," in the first sentence, and deleted the third and fourth sentences. The 1986 version, however, is the operative statute in the case at bar.

Generally, a claimant's medical expert in an occupational disease case must establish the probability that the disease was caused by conditions in the work place. *Sheehan v. Springfield Seed & Floral, Inc.,* 733 S.W.2d 795, 797 (Mo.App.1987). There must be medical evidence of a direct causal connection between the conditions under which the work is performed and the occupational disease. *Estes v. Noranda Aluminum, Inc.,* 574 S.W.2d 34, 38 (Mo.App.1978). Even where the causes of the disease are indeterminate, a single medical opinion relating the disease to the job is sufficient to support a decision for the employee. *Prater v. Thorngate, Ltd.,* 761 S.W.2d 226, 230 (Mo. App.1988). Applying these principles, we find no error in the Commission's determination that Dawson's scleroderma was medically causally related to her job, especially when that determination was also based upon a determination that Dr. Bridges' testimony was more credible.

The decision of the Commission is affirmed.

All concur.