Thomas R. COCHRAN, Employee–
Respondent,

v.

INDUSTRIAL FUELS & RESOURCES,
INC., Employer–Appellant,

and

Travelers Indemnity Co.,
Insurer–Appellant.

No. 22628.

Missouri Court of Appeals,
Southern District,
Division One.

May 17, 1999.

Motion for Rehearing and Transfer to
Supreme Court Denied June 8, 1999.

James B. Kennedy, Evans & Dixon, St. Louis, Mo., for Appellant.

Joseph P. Rice, III, Dickerson, Rice, Spaeth, Heisserer, Summers & Remley, L.C., Cape Girardeau, Mo., for Respondent.

JAMES K. PREWITT, Presiding Judge.

Employer and Insurer appeal a decision by the Labor and Industrial Relations Commission affirming and incorporating an award issued by the Division of Workers' Compensation Administrative Law Judge (ALJ). The employee (Claimant) also made a claim against the Treasurer of the State of Missouri as custodian of the Second Injury Fund. That claim was denied, and the Treasurer is not a party to this appeal. The decision awarded permanent total disability benefits, and past and future medical expenses for Claimant. Claimant alleged that an occupational toxic chemical exposure caused a subsequent manifestation of a rare medical condition, dermatomyositis, and that in the standard course of treatment for this condition, further physical complications developed, rendering him totally and permanently disabled.[1]

■ The fundamental purpose of the Workers' Compensation Law is to place upon industry the losses sustained by employees resulting from injuries arising out of and in the course of employment. The law is to be broadly and liberally interpreted, extending its benefits to the largest possible class. Questions as to the right of an employee to compensation are resolved in favor of the employee. *Brenneisen v. Leach's Standard Service Station,* 806 S.W.2d 443, 445 (Mo.App.1991).

■ The Labor and Industrial Relations Commission is charged not only with reviewing the record but, when appropriate, determining the credibility of witnesses and the weight to be given their testimony, resolving any conflicts in the evidence, and reaching its own conclusions independently of the ALJ's findings. *Dawson v. Associated Electric,* 885 S.W.2d 712, 714 (Mo.App.1994). After the Commission has determined an award in a workers' compensation case, this court will review the Commission's award and not the findings of the ALJ. *Id.* The Commission's final award may be set aside only if there is no substantial evidence to support it or if it is clearly contrary to the overwhelming weight of the evidence. *Id.*

■ Where the Labor and Industrial Relations Commission's award attaches and incorporates the ALJ's award and decision, this court considers the findings and conclusions of the Commission as including the ALJ's award. *Banks v. Springfield Park Care Center,* 981 S.W.2d 161, 163 (Mo.App.1998).

The record reveals that Claimant was employed as a maintenance worker at Industrial Fuels & Resources, Inc. (Employer), in Scott City, Missouri. His employment began in June, 1991. Employer processed a wide variety of waste materials to produce a dry powdered mixture used as supplemental fuel by cement kilns. Waste products processed there contained "a number of solvents and chemicals." To control organic vapor emissions from the processing, a sodium hydroxide solution was used in the scrubber operation. A list of common chemicals processed at the facility was prepared by Employer's general manager, David G.

---

1. Dermatomyositis is described in the record as an autoimmune disease involving skin and muscle inflammation. It is a subcategory of "inflammatory myopathies." It has an inci- dent rate of approximately 5 to 10 per million. Treatment involves a "suppressant type therapy of steroids" or "amino suppressants."

Jordan, and forwarded to Claimant's physician in a letter dated May 6, 1991.

Claimant alleges that, on or about January 25, 1991, as he was cleaning up in an area of new construction near the "Tipler" building, he was exposed to a toxic mist emitted from the exhaust of the scrubber. Feeling dampness on his face, he noticed his mouth burning, followed by irritation on his face, neck and other exposed areas of his body. After noting a "silvery mist just boiling out" of the exhaust, Claimant showered and changed from his damp clothing into dry clothes. He reported the incident to Dale McClure, a plant supervisor, during his shift that night, and testified McClure told him to stay out of the area, and that "we have been having trouble with it."

The day following the exposure, Claimant testified his face became "crusty," and over a period of days, his skin pigment changed to a darker color. He described the skin on his hands wrinkling, and soon began having difficulty breathing and swallowing. He also testified that he became physically weaker, was experiencing muscular aches and pains, and had difficulty breathing and swallowing. After reporting the incident to the "safety man" the second week after the exposure, an appointment with the "company doctor" was arranged for Claimant.

Claimant first saw Paul Spence, a medical physician, on March 11, 1991. He told Spence he had been feeling bad since the exposure, and that his biggest problem was that he could not swallow. Dr. Spence prescribed a topical steroid cream and instructed Claimant not to return to work. His initial diagnosis was chemical exposure burns. Claimant saw Dr. Spence each week following his initial visit, and reported additional symptoms, such as a sore and bleeding nose, vision problems, swollen eyes, splitting skin, and swelling over his body which prevented him from buttoning his short or pants, or tying his shoes. Dr. Spence referred Claimant to another medical physician, Chris Jung, an ear, nose and throat specialist. Dr. Jung, who first saw Claimant on April 10, 1991, subsequently diagnosed chemical dermatitis and recommended consultation with a dermatologist. Claimant's physical condition was worsening, and he next saw Hal Brown, a medical physician and dermatologist, who subsequently ordered skin biopsies. On April 23 and 30, 1991, Claimant saw another medical physician, Robert Perry, at the request of Dr. Spence. Dr. Perry diagnosed toxic chemical exposure with associated dermatitis.

Claimant was hospitalized at St. Francis Medical Center on May 1, 1991. There he was examined by Paul Taylor, a medical physician and rheumatologist, who diagnosed dermatomyositis. On May 2, 1991, Claimant was transferred to Barnes Hospital, in St. Louis, because of the progression in his muscle weakness and dysphasia with symptoms of aspiration (choking). Further tests and consultations were ordered, which confirmed the diagnosis of dermatomyositis, and a regimen of high-dosage prednisone was initiated. Insertion of a gastronomy tube was necessary because of Claimant's difficulty in swallowing and his choking. The tube was not removed until August of 1991. Dr. Perry noted that claimant's liver enzymes were beginning to elevate, possibly indicating internal organ damage.

Claimant continued to see Dr. Spence through early 1993. Dr. Spence also consulted with Jeffrey McNabb, a medical physician. Dr. McNabb reported several additional medical problems, and in 1994, medical physician Wolford Lee diagnosed Claimant as having a gastric infection, for which Claimant was treated. In 1995, a liver biopsy was performed and Claimant tested positive for hepatitis C. Attributed to the prolonged steroid treatment, Claimant also developed cataracts, depression, and aseptic necrosis of the femur, which required replacement of both hips (the right hip in 1993, and the left hip in 1994).

Claimant filed for and received temporary total disability benefits up to and including the month of April, 1993, in the

amount of $24,560.00, and payment for medical care in the amount of $59,000.00. When Claimant required a total hip replacement, Employer and Insurer denied his claim.

When reviewing an appeal of a workers' compensation claim:

> This court engages in a two-step review process: In the first step, the court examines the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the record contains sufficient competent and substantial evidence to support the award. If not, the Commission's award must be reversed. If there is competent and substantial evidence supporting the award, the court moves to the second step, where it views the evidence in the light most favorable to the award, but must consider all evidence in the record, including that which opposes or is unfavorable to the award, take account of the overall effect of all of the evidence, and determine whether the award is against the overwhelming weight of the evidence.

*Avery v. City of Columbia*, 966 S.W.2d 315, 319–20 (Mo.App.1998), *citing Davis v. Research Medical Center*, 903 S.W.2d 557, 571 (Mo.App.1995).

Appellants have seven points relied on, several of which contain sub-points. Many of the issues in the points are repetitive or overlapping, and will not be addressed separately.[2]

*Points I, V, and part of Point VI*

■ In their first point, Appellants claim the Commission erred as Claimant did not produce competent, convicing medical evidence because his experts were less qualified, and the Commission relied on "speculation and conjecture." In their fifth point, Appellants claim the Commission erred in finding causation in that medical causation was not proven within a reasonable degree of probability because evidence was offered by "non-board certified doctors," and no medical literature was presented to support causation. Appellants' sixth point alleges, in part, that the Commission erred in awarding medical and disability expenses because the Claimant did not sustain his burden of proof on the issue of "medical causal relationship."[3]

■ "Decisions concerning the weight to be given expert opinions lie within the Commission's sole discretion and cannot be reviewed by this court." *Avery*, 966 S.W.2d at 320; *Cahall v. Cahall*, 963 S.W.2d 368, 371 (Mo.App.1998). The Commission, as fact finder, has discretion to determine an expert's qualifications to testify on specific matters. *Landers v. Chrysler Corporation*, 963 S.W.2d 275, 281 (Mo.App.1997). It is within the province of the Commission to determine what weight it will accord expert testimony on medical causation. *Id.* at 282. The issue is peculiarly for the Commission's determination where the right to compensation depends upon which two conflicting medical theories should be accepted. *Id.; Cahall*, 963 S.W.2d at 371; *Dawson*, 885 S.W.2d at 714–15.

■ The extensive Findings of Fact adopted by the Commission found sufficient and competent medical and scientific evidence to support the finding of a causal relationship between Claimant's occupational exposure to toxic chemicals and the onset of dermatomyositis. The effect of being "board certified" or not was for the Commission, as was the weight to be given to each expert's testimony. Nor is "medical literature" a prerequisite to finding

---

2. Rule 84.04 governs points relied on in appeals, including workers' compensation cases. That rule requires the point relied on to state "briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous." This Rule has been revised, effective January 1, 1999, providing wording that should be followed in briefs filed after that date.

3. The remainder of Appellants' contentions in Point VI are discussed *infra*.

medical causation. Points I, V, and the part of VI above quoted, are denied.

*Point II*

■ Appellants' second point alleges that the Commission erred in finding that the injury arose out of and in the course of employment because Claimant's own testimony was "confusing and inconsistent and did not contain sufficient competent evidence," and that the Claimant did not meet his burden of proof regarding the onset of the disease and its relation to the chemical exposure.

■ When the resolution of an issue hinges on the credibility of witnesses or the weight given to certain evidence, the scope of our review is significantly curtailed. *Schuster v. Division of Employment Security*, 972 S.W.2d 377, 384 (Mo.App.1998). The weight to be given evidence rests with the Commission and it alone determines the credibility of witnesses. Where competent evidence is conflicting, resolution is for the Commission and its choice is binding upon this court. *Id.*

The Findings of Fact in this case note that Claimant immediately felt a "stinging or burning sensation on his face," and that the decided to take a shower immediately after his exposure to a "silver looking mist or fog" while at work. Claimant testified the exposure was in late January of 1991, and that he immediately reported the incident to his plant manager, who told him to stay out of the area because they "had been having trouble with it." Claimant also testified to symptoms he experienced in the weeks following the exposure. The findings recite that Dr. Perry stated that there was a "strong temporal relationship" between the exposure to the cloud of chemicals and the Claimant's symptoms. Dr. Perry testified that to him, "the temporal relationship ... was undeniable and could not be devalued in [his] clinical assessment that there was something in that chemical cloud or some things, possibly more than one toxic working in concert with another, that triggered this disease process."

Another witness called on behalf of Claimant, Dr. Terry Martinez, a professor of toxicology and pharmacology, testified that it was obvious to him that "it was the chemical exposure that triggered this [disease] because [Claimant] did not have these symptoms before the exposure."

It's like a smoking gun in effect because we know that this particular chemical, two or three weeks later, a person will have strong asthmatica reactions but other chemicals here also are sensitizers. This person was exposed in late January. He apparently had a burn on the skin, on the surface area of the skin that were (sic) exposed that could be sodium hydroxide, although phthalic anhydride and phthalic acid will do that, too. Then that seemed to get better and about two or three weeks later things got worse. That is exactly the time it takes for the immune system to become sensitized and to react.

There was testimony that published medical literature does suggest that there is a strongly suspected connection, and there is no proof that it does not exist.

We find that the Commission did not abuse its discretion in determining the credibility of witnesses who testified on the causation or onset of symptoms. Although there was conflicting competent medical evidence on the issue of causation, the resolution of this was for the Commission, and its choice is binding upon us. *Schuster*, 972 S.W.2d at 384. Point II is denied.

*Points III and IV*

■ In these two points, Appellants allege the Commission erred in finding that Employer received notice, in that Claimant did not notify it of the injury of dermatomyositis, and thus "the employer had no knowledge of the claimed relationship between the incident ... and the claimant's disease until the filing of the claim for compensation dated April 13, 1991," and that it was prejudiced by the

Claimant's failure to give notice within 30 days, since this prevented the employer from investigating facts.

Dates of exposure referred to in record which substantiate Claimant's alleged date of exposure as being January 25, 1991, include the following: Claimant testified the exposure occurred on January 25; the report to Dr. Perry designates January 25 as the date of exposure; Dr. McGinty's report states exposure occurred "late January, thinks it was 27th;" Dr. Spence reported the date of exposure as being the "last part of January,"or January 27.

Claimant testified he reported the incident to a plant supervisor, Dale McClure, immediately following the exposure that same night, and was told by McClure to stay out of the area. He further testified that in the second week following the incident, after previous attempts, he reported the incident to the "safety man," who agreed with Claimant that his face was noticeably redder and told Claimant he would obtain a cortisone cream.

■ Notice given to or possessed by supervisory employees is imputed to the employer. *Hillenburg v. Lester E. Cox Medical Center,* 879 S.W.2d 652, 654–55 (Mo.App.1994). The issue of whether a claimant has provided his employer with actual notice of a compensable injury is a question of fact to be determined by the Commission. *Shaffer v. St. John's Regional Health Center,* 943 S.W.2d 803, 806 (Mo.App.1997).

Not long after the exposure, Claimant was told he would have to see the "company doctor,"yet his first appointment with Dr. Spence, presumably the "company doctor," was March 11, 1991. It was not until May 1, 1991, when he was examined by rheumatologist Dr. Paul Taylor, that the initial diagnosis of dermatomyositis was made. Claimant could not have been expected to know the diagnosis at the time he filed his claim. He did report an injury. It would be unreasonable under these circumstances, to require a lay person to make a medical diagnosis regarding his illness or injury.

The findings and rulings in this case addressed Appellants' contention that notice was a disputed issue, responding: "[T]here is absolutely no evidence to support a denial of the employee's claim based on lack of notice ... The evidence in this case unequivocally supports a finding that the employer had adequate notice under Section 287.420 RSMo." The Commission ruled that Employer had actual notice within thirty days and was not prejudiced by failure to give written notice. The record supports these determinations. Points III and IV are denied.

*Part of Point VI*

■ Part of Point VI not previous discussed asserts that the Commission erred in ordering Appellants to "provide future medical" care.

■ The claimant is not required to present evidence on the specific medical treatment which will be necessary in the future in order to receive an award of future medical care. *Landers,* 963 S.W.2d at 283. However, where future medical benefits are awarded, the medical care must flow from the accident before the employer is to be held responsible. *Id.* It is not the claimant's burden to produce "conclusive testimony or evidence" to support his claim for future medical benefits. *Id.* It is sufficient to award future medical benefits if the claimant shows by "reasonable probability" that he is in need of additional medical treatment by reason of his work-related accident. *Id.* In *Landers,* two doctors testified for employer that claimant needed no additional treatment. Noting its deference to the Commission in resolving conflicting evidence, the court affirmed the award for future medical care.

There was testimony from Dr. McGinty, and it appears undisputed, that Claimant will need medical care in the future. The part of Point VI relating to future medical care is denied.

*Remainder of Point VI and Point VII*

 Appellants allege the "Commission's ruling that the employee is permanently and totally disabled was not supported by sufficient competent evidence," and that there was no "proof on the issue of medical-causal relationship."

The doctors agreed that Claimant was afflicted with dermatomyositis. There was no dispute that the treatment for dermatomyositis involved high dosages of prednisone for an extended period of time. Consequences of such steroid therapy include aseptic necrosis of the femur (hip), cataracts, and depression, all which Claimant has received treatment for in the period since the diagnosis of dermatomyositis. During the period when Claimant received worker's compensation benefits and medical care payments, he was under the care of company-authorized physicians in whose opinion it was necessary for Claimant to undergo the steroid treatments to treat the dermatomyositis. Appellants protested the payment of temporary total disability benefits when it learned Claimant required a right hip replacement.

Dr. McGinty testified that, in his opinion, Claimant will not be employable. He opined that Claimant would be limited to very sedentary-type work. No evidence was heard to the contrary.

Under Missouri law, a Workers' Compensation claimant alleging permanent disability must adduce medical evidence demonstrating with reasonable certainty that the disability is in fact permanent. *P.M. v. Metromedia Steakhouses Co., Inc.*, 931 S.W.2d 846, 849 (Mo.App. 1996). *Id.* "There is nothing talismanic about the phrase 'reasonable certainty.' The words a medical expert uses when testifying are important, not in themselves, but as a reflection of any doubts [one] may have about the permanence of the injury." *Id.* Total disability means the inability to return to any reasonable employment. *Sifferman v. Sears, Roebuck & Co.*, 906 S.W.2d 823, 826 (Mo.App. 1995). It does not require that the claimant be completely inactive or inert. *Id.*

The determination of whether plaintiff was totally and permanently disabled was a question of fact for the Commission. *Julian v. Consumers Markets, Inc.*, 882 S.W.2d 274, 275 (Mo.App.1994). The Commission does not have to make its decision only upon testimony from physicians, it can make its findings from the entire evidence. *Id.* After our review of the record, we do not find that the Commission erred in its determination that Claimant is totally and permanently disabled. The remainder of Point VI and Point VII are denied.

The award is affirmed.

CROW, J., and PARRISH, J., concur.