Bonita MILLER, Appellant,

v.

U.S. AIRWAYS GROUP, INC., Respondent.

No. WD 70840.

Missouri Court of Appeals, Western District.

May 11, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 29, 2010.

Application for Transfer Denied Aug. 31, 2010.

Kristi L. Pittman, Esq., Liberty, MO, for appellant.

Eric T. Lanham, Esq., and Douglas M. Greenwald, Esq., Kansas City, KS, for respondent.

BEFORE DIVISION ONE: LISA WHITE HARDWICK, Presiding Judge, JAMES M. SMART, JR. and ALOK AHUJA, Judges.

LISA WHITE HARDWICK, Judge.

Bonita Miller appeals from a final award denying her workers' compensation claim for repetitive trauma injuries from carpal tunnel syndrome that developed as a result of her employment with U.S. Airways Group, Inc. ("Employer"). The Labor and Industrial Relations Commission ("Commission") denied relief because Miller had an earlier claim pending against the Employer for injuries related to carpal tunnel, and the Commission determined that the repetitive trauma was not a "new and distinct injury." Miller contends the Commission's decision is not supported by competent and substantial evidence in the record. For reasons explained herein, we find no error and affirm the final award.

## FACTUAL AND PROCEDURAL HISTORY

Miller began working for the Employer in 1984. Since May 1991, she has worked full-time as a customer service agent at Kansas City International Airport, where her primary duty is to check-in airline passengers. Her work involves repetitive activities with frequent use of her hands and arms, such as keyboarding, tearing off baggage claims and boarding passes from the computer terminals, and lifting luggage.

In 2002, Miller began to experience pain in her upper extremities and was diagnosed by her physician with early signs of carpal tunnel syndrome. Two years later, the symptoms intensified with numbness, pain, and tingling in her hands. In June 2004, Miller requested medical treatment from the Employer because she believed her condition was work-related. The Employer filed a "Report of Injury" with the Division of Workers' Compensation and provided treatment through its insurer, AIG. Miller was diagnosed with mild bilateral carpal tunnel syndrome. She underwent five weeks of physical therapy, took prescribed medication for several weeks, and wore splints at night. In October 2004, Miller was released from treatment with no limitations on her ability to work.

Miller continued to perform her work duties without significant pain or difficulty until late 2006 and early 2007, when she worked substantial overtime due to a heavy holiday schedule. She experienced increasing discomfort in her hands, with sharp pains extending into her forearms causing an "electrical shock" sensation. After receiving notice of these symptoms on January 29, 2007, the Employer filed a second "Report of Injury" and referred the matter to AIG. The insurer declined to approve further treatment for Miller.

On October 26, 2007, Miller filed two separate workers' compensation claims seeking "temporary total and permanent disability" benefits from the Employer for injuries related to carpal tunnel syndrome. The first claim, No. 04–054594, alleged that Miller suffered "[r]epetitive trauma through 6/4/04" ("2004 claim"). The second claim, No. 07–070265, alleged that Miller suffered "[r]epetitive trauma through 1/29/07" ("2007 claim"). Both claims gave an identical description of Miller's alleged injury:

> During the course and scope of employment as a customer service representative, Employee suffered repetitive trauma to her bilateral upper extremities due to lifting luggage and by keyboarding resulting in bilateral carpal tunnel syndrome. Employee requires medical care, will suffer temporary total and permanent disability.

Miller also filed a third workers' compensation claim against the Employer for injuries related to carpal tunnel syndrome. The third claim, No. 05–144695, alleged that Miller suffered repetitive trauma through August 28, 2005.[1] The three claims proceeded independently and were not consolidated.

In June 2008, an Administrative Law Judge ("ALJ") held a hearing on the 2007 claim. Miller testified that she first reported symptoms of carpal tunnel syndrome to her employer in 2004. She underwent treatment and took ibuprofen as necessary after she was released from treatment. When her symptoms worsened in late 2006, she again reported them to the Employer in early 2007.

At the hearing, the Employer admitted that Miller sustained carpal tunnel syndrome in the course of her employment but denied that she sustained the injury in 2007. The Employer presented independent medical evaluations of Miller conducted by two orthopedic specialists, Dr. Anne Rosenthal and Dr. James Stuckmeyer. Both physicians noted that Miller's diagnosis of carpal tunnel syndrome dated back to 2002. They concluded that Miller's condition was occupationally related to her hand intensive, repetitive job duties during the course of her twenty-five year employment with U.S. Airways.

Following the hearing, the ALJ issued a decision denying the 2007 claim because it alleged the same injury, bilateral carpal tunnel syndrome, for which Miller received treatment in 2004 and for which she still had a 2004 claim pending. The ALJ also determined that the 2007 claim was time-barred by recent amendments to Section 287.063.1, which affected the accrual dates under the statute of limitations in Section 287.430.[2]

On review, the Commission affirmed the denial of compensation on the 2007 claim. The Commission found that Miller did not sustain a new and distinct injury in 2007 because her repetitive trauma stemmed from the same bilateral carpal tunnel syndrome that she was treated for in 2004. The Commission's final award incorporated the ALJ's decision to the extent that it was consistent with this finding; however, the Commission declined to adopt or incorporate the ALJ's conclusions regarding the

---

**1.** We are unable to determine the filing date for the 2005 claim. The parties did not provide a copy of the 2005 claim in the record. The only reference to this claim is in the Commission's Final Award on the 2007 claim, which urged the Division of Workers' Compensation to consider consolidating the 2004 and 2005 claims for trial.

**2.** All statutory references are to Revised Statutes of Missouri (2000) as updated by the Cumulative Supplement (2009).

statute of limitations.[3] Miller appeals the final award.

## STANDARD OF REVIEW

"Where the Labor and Industrial Relations Commission's award attaches and incorporates the ALJ's award and decision, this court considers the findings and conclusions of the Commission as including the ALJ's award." *Cochran v. Indus. Fuels & Res., Inc.*, 995 S.W.2d 489, 492 (Mo. App.1999). We review only questions of law and may modify, reverse, remand for rehearing, or set aside the award when the Commission acted without or beyond its power, the award was procured by fraud, the facts do not support the award, or the award is not supported by sufficient competent evidence in the record. § 287.495.1.

█ "We examine the whole record to determine the sufficiency of the evidence." *Marmon v. City of Columbia*, 129 S.W.3d 921, 924 (Mo.App.2004). "An award of workers' compensation benefits 'that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence.'" *Kerns v. Midwest Conveyor*, 126 S.W.3d 445, 452 (Mo.App.2004) (quoting *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. banc 2003)). A decision is against the overwhelming weight of the evidence if we are left with a firm impression that the decision was incorrect. *Id.* "We will find an award by the Commission to be contrary to the overwhelming weight of the evidence only in rare cases." *Vincent v. Mo. State Treasurer*, 287 S.W.3d 715, 718 (Mo.App.2009).

## ANALYSIS

█ Miller brings two points on appeal. First, she contends the Commission's de-

termination that she did not suffer a new injury in 2007 is unsupported by competent and substantial evidence in the record. Second, Miller asserts the Commission erred in failing to determine when her 2007 claim accrued for purposes of applying the statute of limitations. Because we find no error in the Commission's determination that Miller did not suffer a new injury in 2007, we need not address Point II.

In denying Miller's 2007 claim, the Commission adopted the following findings in the ALJ's decision:

The Employee filed two Claims for Compensation on or about October 26, 2007 for her previously diagnosed bilateral carpal tunnel syndrome, alleging in each claim an identical repetitive trauma injury to bilateral upper extremities, with one alleging a date of accident of occupational disease of a repetitive trauma through 6/04/04 (Injury # 04–054594) and the other alleging a date of accident or occupational disease of repetitive trauma through 1/29/2007 (Injury # 07–070265).

I find the work-related medical condition of ill alleged in the Claim for Compensation, Injury # 07–070265, ... is the same work-related medical condition of ill for which Claimant received medical treatment back in 2004. Undoubtedly, her symptoms have become more severe over the years, but I find that it is the same disease, same diagnosis, and same medical condition of ill—bilateral carpal tunnel syndrome. The change in her condition is one of degree not one of kind or type ... There has only been a worsening of Claimant's injury not a new or different injury.

---

**3.** The Commission concluded that the statute of limitations issue would be more properly addressed in the resolution of the 2004 claim.

The Commission's finding that Miller did not suffer a new injury in 2007 is supported by substantial evidence in the record. The Employer presented medical records to establish that Miller's carpal tunnel syndrome dated back to at least 2002 and had grown progressively worse. Dr. James Stuckmeyer opined:

I feel within reasonable medical certainty that as a direct, proximate and prevailing factor of the repetitive nature of the occupational duties required upon Ms. Miller throughout 25 years of employment with U.S. Airways that she has developed progressively worsening neurological symptoms in both the right and left hand requiring medical treatment.

The medical records would reflect that dating back to 2002 she was assessed by Dr. Sachen as having very early carpal tunnel syndrome. Obviously, the development of carpal tunnel syndrome is usually related to repetitive activities, and Ms. Miller's occupation would surely fit into this classification. This would represent a series of repetitive overuse type syndrome bilaterally.

Similarly, Dr. Anne Rosenthal noted Miller's history of complaints and treatment for carpal tunnel syndrome between 2002 and 2008. Rosenthal concluded that Miller's condition resulted from the repetitive nature of her job duties throughout her long-term employment:

[Miller's] occupation exposure is the prevailing factor in causing her bilateral carpal tunnel syndrome. She has a hand intense repetitive job, works 40 hours per week, has been working for U.S. Airways for 25 years, and has no medical problems or outside activities that she does with enough intensity that would be the prevailing factor. Again, the bilateral carpal tunnel syndrome is vocationally related.

The worsening of Miller's symptoms in late 2006 or early 2007 did not establish a new injury of repetitive trauma. The medical evidence, as well as Miller's allegations on her three workers' compensation claim forms, clearly established that the repetitive trauma was a continuing symptom of her carpal tunnel syndrome that was originally diagnosed in 2002 and treated in 2004. Because Miller's 2007 claim alleged injuries resulting from the same occupational disease alleged in her pending 2004 claim, she was not entitled to pursue duplicative claims. We find no error in the Commission's denial of the 2007 claim on this basis.

We emphasize that, although the Commission's final award denominates its disposition as a "denial" of Miller's 2007 claim, we read the Commission's decision as dismissing the 2007 claim because it was duplicative of other claims Miller then had pending in the Division of Workers' Compensation. As we have noted, the Commission's final award specifically states that the limitations issues raised by Miller's multiple claims will be addressed in further proceedings on her 2004 claim. Because it merely held Miller's 2007 claim to be duplicative of the 2004 claim, the Commission's final award on the 2007 claim could not have any preclusive effect on the substance of Miller's underlying workers' compensation claim, or on any defenses available to the Employer; it merely deferred the litigation of those issues to Miller's 2004 claim. Cf. *Golden Valley Disposal, LLC v. Jenkins Diesel Power, Inc.,* 183 S.W.3d 635, 642 (Mo.App. 2006) (while pendency of another civil action may justify dismissal of later-filed action under abatement or "pending action" doctrine, "[t]he pendency of another action between the same parties for the same cause in this state . . . is only a ground for dismissal of the second action without prej-

udice"); *In re Marriage of Gormley,* 813 S.W.2d 108, 112 (Mo.App.1991) (same).

### CONCLUSION

The Commission's final award is affirmed.

Judge AHUJA concurs.

Judge SMART concurs in separate concurring opinion.

JAMES M. SMART, JR., Judge, concurring.

The Commission concluded that the evidence shows that Bonita Miller's carpal tunnel disease is the same carpal tunnel disease she had in 2004. To the extent that is a factual conclusion, I cannot disagree. I am not sure that the Commission should be understood as ruling as a matter of law that there was only one "injury" within the meaning of section 287.063. But even assuming that the Commission so decided, there was no legal ruling on the statute of limitations issue (which the ALJ found dispositive). The Commission was aware that Ms. Miller had two other claim forms pending in the Division seeking the same relief. Therefore, I would have expected the Commission to either consolidate all the claims seeking the same relief, or to dismiss as duplicative all the claims except the one the Commission intended to address on the merits.

Ms. Miller was informed in 2002 that she had early mild carpal tunnel. The condition did not bother her until June of 2004. At that time, she sought and obtained treatment from her employer. She did not have to file a formal claim to prove her right to treatment. The therapy and suggestions she received on managing the carpal tunnel were helpful, so it was not until January of 2007 that she asked for further treatment. At that point, her employer's workers' compensation insurer denied

treatment on the ground that she has had mild carpal tunnel syndrome for several years and therefore was barred from receiving further treatment by the two year statute of limitations. The ALJ agreed with the employer. She appealed to the Commission, which issued the unusual ruling we consider at this time.

Because my colleagues are convinced that the "denial" of the claim here was the functional equivalent of a dismissal without prejudice as to Miller's other claims, I concur in affirming rather than arguing for dismissal of the appeal on jurisdictional grounds, though I would have thought the Commission would have termed *its* ruling a "dismissal" on grounds the claim was duplicative. Had the Commission done so, the claimant would not have feared that she needed to appeal, and we would not find ourselves "affirming" the Commission when otherwise we arguably would be dismissing the appeal for lack of a final award. *See, e.g., Korte v. Fry–Wagner Moving & Storage Co.,* 922 S.W.2d 395, 397 (Mo.App.1996).

All of that aside, however, I feel compelled to write separately to offer some thoughts and observations, some of which will be obvious *obiter dictum,* on matters that were addressed in the ALJ decision and will be raised again in the further processing of Ms. Miller's claim for medical treatment.

All the claimant seeks is treatment under 287.140 so she can keep working. She has not been asking for a disability rating (although it may get to that if her treatment keeps getting delayed). The ALJ, in fully addressing the statute of limitations issue in her decision, misconstrued (in my view) the effect of the 2005 amendment to 287.630 (which deals with the accrual of claims for occupational disease) causing the ALJ to conclude that all the claims filed by the claimant are barred. In my

view, the ALJ's attempt to apply the General Assembly's cloudy will as to the accrual of occupational disease claims, together with the current forms and practices in the Division, created a tangle of confusion, both actual and semantical.

The Commission attempted to make a first step toward unraveling the tangle, but unfortunately did not consolidate all three claims (the first two of which were filed simultaneously anyway) and address the issues in question.

## Claims Confusion

This is an astounding case of "claims confusion" arising in part from the fact that the Division of Workers' Compensation attempts to process claims for occupational disease in the same way it processes claims for accidental injury. Here we have multiple claim forms bearing separate "injury" numbers, all filed at the same time, and all directed to one thing: obtaining medical treatment for Ms. Miller for her current condition of carpal tunnel. Ms. Miller's counsel, being aware of the prior "reports of injury" filed by the employer, filed two claims, one citing exposure in 2004 and one citing exposure in 2007, corresponding to the "reports of injury" filed by the employer. Later in the claims adjudication process, after the statute of limitations issue was pressed by the employer based on the 2005 revisions to section 287.063.3, Ms. Miller's counsel, out of an abundance of caution, filed a third claim, reciting the date of exposure as the period leading up to the effective date of the 2005 amendments. We thus have three claim forms for what is only one claim.

The Division uses the same forms for both accident claims and occupational disease claims. The employer's "report of injury" form is clearly designed for the reporting of an injury by way of "accident"

because it contemplates that the injury occurred on a single date. The formal claim used by the Division, while purporting to make some accommodation to occupational injury claims, is poorly adapted, especially for claims involving slowly developing occupational disease, such as repetitive motion claims. The formal claim form provides a box in which to insert "date of accident/occupational disease." Again, the form fails to recognize that many occupational disease conditions do not have a "date." Unlike an injury due to accident, an occupational disease develops over a period of time and is not caused by an event on a single day. *See Garrone v. Treasurer of State of Mo.*, 157 S.W.3d 237, 243 (Mo.App. 2004). The claim form does not ask for "date of diagnosis of occupational disease," or "date that you observed symptoms caused by occupational disease" or "date that your occupational disease required treatment," or "date that you first missed work due to your occupational disease."

Lawyers for claimants are required to guess at how to complete the claim in response to the inquiry, "date of occupational disease." Some practitioners suggest that in the pertinent box they should list "dates of exposure," possibly with a "culminating date." That culminating date, it is thought, could be "the last date of exposure." *See id.*; II *Mo. Workers' Compensation Law*, section 11.4 (Mo. Bar 3rd ed.2004).

Common sense would indicate, of course, that dates of exposure do not correspond to the date a condition was recognized as having reached the point at which it is appropriate to file a claim. Nor does the period of time during which an underlying condition develops necessarily correspond to the date that one has any practical reason to file a claim. Various diseases have different latencies, and those latencies can differ from person to person. Also, the mild nature of some developing

occupational diseases can contribute to confusion when it comes to determining the appropriate time to file a claim for such a condition, and the proper time to consider the applicable period of limitations to begin to run.[4] As to slowly developing conditions arising from repetitive trauma, therefore, the "date of occupational disease" box on the claim is generally impossible to answer in a coherent way.

The Commission found that the repetitive trauma condition Miller was experiencing in January 2007 was the same "injury" that she had in June 2004. Clearly, it was the same underlying condition of carpal tunnel syndrome, but Miller argues that it was a different "injury" (as a legal, even if not a factual concept) for purposes of determining the limitations period.

Whether Miller's carpal tunnel condition in 2007 is a new carpal tunnel condition or the same old carpal tunnel condition is a question of fact for the Commission. *See Rupard v. Kiesendahl*, 114 S.W.3d 389, 394 (Mo.App.2003). The Commission says that there "has only been a worsening of [her] *injury*, not a new or different *injury*" (emphasis added). The Commission here necessarily equates "injury" with Miller's underlying carpal tunnel disease itself. At the same time, however, the Commission also uses the word "injury" as meaning "claim," as in "claim form." Thus, the Commission ends up saying to Ms. Miller that "your injuries are really one injury" when it means "your *claim forms* are really about only one occupational disease."[5]

Part of Miller's argument is an attack on the factual conclusion that it was the same carpal tunnel in 2007 as 2004; but partly it is also an argument based on the concept of accrual of an "injury" (in the sense of when a claim has matured and may be filed). She points out that she never missed any work in 2004, continued capably to do her job, and suffered no impact on her earning capacity. She points out that until 2007 Miller never had any occasion to file a *formal claim*. She made, in effect, an informal claim in 2004 in requesting medical treatment for her carpal tunnel condition.

Claimant Miller argues that the Commission should have decided either (1) that the 2007 condition was a new "injury" (thus avoiding any statute of limitations analysis altogether), or (2) determining at some point that the statute of limitations does not bar her claim for her 2007 condition because the earlier manifestations of her condition simply did not trigger the accrual of a claim for purposes of the period of limitations.

Section 287.063.3 does not define "injury" for purposes of that section (dealing with the accrual of claims). No court has yet defined it either. The meaning of the word in that particular statutory context is a question of law, of course.[6] The claimant says that she had no practical reason to file a formal claim until she was denied treatment after her late 2006 and early 2007 activities caused an increase in the

4. *See, e.g.,* the cases cited and discussed at 29 Mo. Practice Series, *Workers' Compensation Law and Practice,* section 4.18.

5. It might also be helpful if the Division and the Commission used the term "injury" in a univocal way to mean physical injury, and used the term "claim" to mean "claim."

6. Section 287.020 declares that "except as specified in Chapter 287," the term "injury" shall not include "occupational disease in any form[.]" Section 287.067.3 then recognizes "an injury due to repetitive motion," which the cases have regarded as including carpal tunnel syndrome. *See, e.g., Miller v. Unitog Co.,* 965 S.W.2d 373, 373–74 (Mo.App.1998) (carpal tunnel syndrome caused by repetitive motion or trauma is a "known occupational disease").

symptoms of her condition. In 2004, she did the only practical thing: she reported her condition to the employer and asked for permission to see a physician and obtain treatment. The Commission, she says, should have recognized and specifically ruled that a duty to file a formal claim for "injury" cannot accrue until a worker actually has some practical reason to file a formal claim. The Commission should therefore, she says, have specified that her claim for her 2007 condition is not barred, and that she is entitled to medical care. Ms. Miller is asking whether it can be right, as a matter of law, to say that the General Assembly intended to entirely release the employer from any duty of providing treatment for the symptoms of a second flare-up three years after a first flare-up unless the employee has, in the meantime, filed a claim, seeking neither treatment nor compensation nor anything else, but seeking only to be on record, hoping the claim will be held in abeyance *indefinitely* by the Division until there is a reason to seek additional medical treatment or compensation for disability.

### Section 287.063

The parties here, thinking we might review the Commission's ruling on the legal merits, fully briefed their views on the statute of limitations issue. The employer's position is that recent amendments to section 287.063.3 dictate that there can be only a two-year window in which to file a claim as to any occupational disease condition—not only as to a claim for disability compensation, but also as to a claim for treatment of a flare-up under section 287.140.[7] The employer argues that the two-year window begins when the work-produced disease is reasonably *discover-*

*able*, even if it is so latent and asymptomatic that there is no reason to file a claim. If the symptoms get worse or the work interference occurs *after* that two-year period, it is simply too late and too bad. The employer argues (based on the 2005 revisions of section 287.063) that the two-year limitations period (pursuant to section 287.430) began to run years ago and was expired well before the claimant filed her formal claims.

In order to understand the employer's argument we must note the pre–2005 language of subsection 3 of 287.063:

> The statute of limitations referred to in section 287.430 shall not begin to run in cases of occupational disease until it becomes reasonably discoverable and apparent that a compensable injury has been sustained, except that in cases of loss of hearing due to industrial noise said limitation shall not begin to run until the employee is eligible to file a claim as hereinafter provided in section 287.197.

We compare that language with the language after the 2005 amendment:

> The statute of limitations referred to in section 287.430 shall not begin to run in cases of occupational disease until it becomes reasonably discoverable and apparent that an injury has been sustained related to such exposure, except that in cases of loss of hearing due to industrial noise said limitations period shall not begin to run until the employee is eligible to file a claim as hereinafter provided in section 287.197.

In this comparison of these two subsections, we see that the phrase "compensable injury has been sustained" has been re-

---

7. The claimant makes clear that all she wants here is treatment under 287.140. She does not seek disability compensation, despite the fact that her claim form may also mention such compensation. In any event, the two forms of relief could be considered severable if one were barred by limitations but one were not.

placed by the phrase "injury has been sustained related to such exposure." No case or other authority has informed us as to the reason for the amendment of the statute. The statute clearly has long served the obvious purpose of protecting the opportunity of workers with occupational diseases to file claims. One way the statute does this is by forestalling the running of the period of limitations until an occupational disease is "reasonably discoverable and apparent." Accordingly, if a worker develops a lung condition that usually develops slowly, and the worker does not know for many years that he or she has the condition, the worker will not be foreclosed from asserting a claim until two years after it is "reasonably discoverable and apparent." Another way the statute purported to protect workers was to define accrual as occurring only when an "injury/disease" became "compensable." That phrase "compensable injury" was ambiguous, however. The phrase was sometimes interpreted by the courts to mean that the limitations period did not begin to run until the employee suffered *significant* inability to work, or was medically advised to cease working, or suffered decreased earning capacity. *See, e.g., Rupard,* 114 S.W.3d at 394. Thus, according to that theory of what the phrase meant, the claim did not even accrue for limitations purposes, in many cases, until there was substantial disability.

This interpretation of "compensable injury" obviously allowed a gap to be created (at least in some cases) between the earliest date one would ordinarily expect to be able to file a claim (say, the date the worker, after experiencing symptoms, sought treatment and received a diagnosis for a disease) and the date the claim legally accrued (because the claim could not legally accrue under court interpretations until the condition involved *significant* interference with work or with earning capacity). Accordingly, claimants could be aware of, and suffering symptoms of, their occupational diseases long before the accrual statute specified that their claim had accrued. Possibly, in 2005, the General Assembly wished to close that gap. Perhaps the General Assembly wanted the date of a worker's reasonable responsibility to file a claim to correspond chronologically with the date of the legal accrual of the claim, in accord with the normal, if not the universal, objective.

Ordinarily, in filing a claim for occupational disease, one need allege only an "injury" by occupational disease arising out of and in the course of the employment. See section 287.067.1. In ordinary, everyday communication, we might describe an incident of minor trauma, such as a bruise, as an "injury." The blood vessels are a physical structure of the body, so the blow causing the bruise can be described as "violence to a physical structure of the body."[8] But the Division would have no realistic authority to issue any directives to an employer in regard to such bruise because there would be no need for medical treatment; much less would a disability rating be applicable to this mishap. It is common sense that an "injury" must be an event of sufficient measure of physical consequence to the body and its structures so as to reasonably be subject to the authority of the Division, at least arguably. It must be something as to which the Division would have authority to act. And a claim, therefore, must plead an "injury" in that sense. Hence, section 287.430, the general statute of limitations, states that

---

**8.** The definition of "injury" in 287.020.3(5) is "violence to the physical structures of the body and to the personal property which is used to make up the physical structure of the body [such as artificial limbs.]" Violence, of course, is synonymous with "trauma."

generally a claim must be filed with the Division "within two years after the date of injury[.]"

In other contexts, the reference to an injury being "compensable" also may be considered simply a short-hand way of referring to the direct relationship with the employment.[9] In 2005, if the General Assembly had wished to avoid any confusion arising from use of the word "compensable,"[10] or had wished, as hypothetically suggested above, simply to bring the language of section 287.063.3 into conformity with the terminology of 287.430, the General Assembly might have believed it could do that by eliminating the word "compensable" as an adjective modifying "injury," while substituting (for extra clarity) in its stead the phrase, "related to such exposure."

The employer here suggests that the amendment was an attempt by the General Assembly to restrict the previously established right to benefits in the case of a slowly developing occupational disease. Under this theory, if a worker learns from visiting a healthcare provider that she has early, asymptomatic carpal tunnel syndrome, and if the worker has good reason to believe the condition was caused by her employment, the limitations period begins to run at that time, even though it is not clear why one would then file a claim because the condition remains asymptomatic and does not interfere with work in any way. Under that theory, if the 2005 amendments are to be understood as suggested by the employer and are retroactive, Miller's request for treatment in 2004 for carpal tunnel possibly was already barred by the statute of limitations before it ever became symptomatic (because in April of 2002, as a result of nerve tests for neck pain, she was incidentally informed of "very early mild" asymptomatic carpal tunnel in her left wrist).

To support further its view that the General Assembly intended to substantially restrict opportunities to file claims, the employer also points to the language of section 287.800, which, since 2005, prescribes a "strict" construction of the provisions of the chapter. The employer is arguing that this would mean that "injury" would be strictly construed for limitations purposes so that once a condition of any kind has been reasonably identified, the limitations period will be deemed to have commenced, even if the claimant reasonably believes the condition will quickly improve and even if one believes it might be ten years or more before there is any

9. *See* 287.067.2 and .3 (an "injury by occupational disease is compensable only if the occupational exposure was the prevailing factor in causing both the resulting medical condition and disability"). *See also* section 287.140.13(3). In that subsection, the word "noncompensable," in referring to the possibility that the employer would provide medical services to an injured employee only to find out later that the injury was "noncompensable" (*i.e.*, presumably did not arise out of and in the course of the employment), the employee may be pursued personally by the health care provider for the cost of the treatment provided.

10. Cases looking at "compensable" injury for limitations purposes may have misinterpreted legislative will, and may have appeared to the legislature to be overly generous in the construction of the word "compensable," as though "compensable injury" comes later in time than an "injury." For instance, in *Sellers v. Trans World Airlines, Inc.*, 752 S.W.2d 413, 416–17 (Mo.App.1988), the court held that the statute began to run only when the doctor told the worker not to return to work. In *Rupard*, 114, S.W.3d at 395–96, the court held the limitations period did not begin to run until the worker's pain became intolerable and the need for surgery was manifested. Such a rule gives the employee "every possible advantage in the time required for filing his claim." *Staples v. A.P. Green Fire Brick Co.*, 307 S.W.2d 457, 461 (Mo. banc 1957).

impact on earning capacity or work performance. Under this interpretation, and if this is in fact the law, then the two-year statute of limitations will bar the occupational disease claims of the conscientious workers who keep working and attempt to "work through" their condition as long as possible before asking for any compensation or even for medical attention.

There is, within the statutory framework, a discernable principle that claimants should be allowed a reasonable opportunity to file a claim without being foreclosed by the statute of limitations. That was, of course, one of the original and longstanding purposes of section 287.063.3. Whether one believes that remains a purpose of the current section 287.063.3 as to repetitive motion claims depends on whether one believes that the General Assembly in 2005 wished to essentially eliminate slowly developing repetitive motion claims from the workers' compensation scheme altogether.

Miller's argument would suggest that the General Assembly's members surely would understand that an "injury" is a work-connected bodily condition for which a worker is *entitled to file a claim* and seek some compensation or relief under the statutes. Miller's argument is consistent with the notion that the word "injury" is a word that, for purposes of the com-

mencement of the limitations period, must carry with it the idea that there is merely *some* degree (and not necessarily a *significant* or *intolerable* degree) of work interference, practical disability or loss of earning capacity. There must be, Miller says, some practical reason or basis for filing a claim before the claim can be considered to have accrued.[11]

If a worker with carpal tunnel desires only minor medical treatment under 287.140, and the employer voluntarily provides it, and the physicians anticipate little future difficulty, should the claim for carpal tunnel be considered to have accrued at that time? That is the exact question lurking here. And if so, one wonders whether the worker's request for medical treatment for the condition should logically be considered to be also the *de facto* filing of a claim for limitations purposes? If not, then we can only say that it is ironic that if the employer *denies* liability and refuses to provide any treatment, the employee will file a formal claim for treatment, thus incidentally obtaining complete protection for herself from a statute of limitations issue. Accordingly, an employer's early recalcitrance could turn out to be a fortuitous windfall for the claimant in the long run, preserving a claim that would otherwise be lost.[12]

---

**11.** It is not clear how a formal claim would be processed if the condition were asymptomatic, or easily treatable by services the employer voluntarily provides. Miller suggests such a claim would be dismissed. We do not know whether the Division could or does maintain a special type of processing of claims for dormant or latent but diagnosed occupational diseases.

**12.** The statutes require only that a worker have an "injury" as a condition of filing a claim. It could be *argued* that the former phrase "compensable injury" in 287.063.3 (dealing with the accrual of claims of occupational disease), was originally intended by the

General Assembly to essentially mean the same as a symptomatic "injury" by way of occupational disease—the point at which the condition has reached the point that there is some reason to file a claim. Perhaps the use of the word "compensable" in the statute was an overcompensating, and, in retrospect, ill-advised attempt to keep slowly developing conditions from being barred before they ever became symptomatic. If that were the case, the removal of the term "compensable" does not necessarily take us back to an extreme position the other direction. One wonders why it would not make sense to have an everyday understanding of the concept of the accrual of an injury by way of occupational

The claimant argues that, in any event, *even if* the General Assembly intended the 2005 amendments to be interpreted as the employer says, the Commission should nevertheless have recognized, and stated, that the 2005 amendments must be applied prospectively, and not retrospectively, to her claim, because to do otherwise would entirely deprive her of her previously vested right to file a claim for her condition and to obtain medical treatment for her carpal tunnel, which clearly arose out of and in the course of the exposure through her employment. Claimant argues that if the Commission had ruled the matter on the basis of the retrospective application of the 2005 amendment dealing with the purported change in accrual of occupational injuries, we would be required to consider the possible impact on any vested rights existing prior to the statutory amendment.

The Commission's decision here amounted to no more than a factual determination that there was one occupational disease condition, but no part of the decision addressed the legal issues of the matter, especially the one found dispositive by the ALJ. As the principal opinion indicates, the decision of the Commission "denying" the formal claim in this context has no preclusive effect as to the positions of the parties on the legal issues. The Division's compliance with the Commission's order to consolidate and adjudicate the two remaining claims will ultimately, despite the semantical and conceptual difficulties here, resolve Ms. Miller's claim for treatment under 287.140.

disease—that being that the claim accrues when there would first be a reason to file the